Filed 8/22/13 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JAMIE THOMAS,<br><br>        Defendant and Appellant.<br><br>───────────────────<br><br>In re JAMIE THOMAS,<br><br>        on Habeas Corpus. | A129933<br><br>(Alameda County<br>Super. Ct. No. C158950)<br><br><br><br>A136593<br><br>ORDER DENYING PETITION FOR<br>REHEARING AND MODIFYING<br>OPINION: NO CHANGE IN<br>JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on August 1, 2013, be modified as follows:

1.      At page 13, following the citation to *People v. Beltran* (2013) 56 Cal.4th 935, 941–942, add as footnote 4 the following footnote, which will require renumbering of all subsequent footnotes:

        [4]The petition for rehearing is pending.

2.      At page 14, after the second full paragraph, add the following two paragraphs:

        The People disagree.  In a petition for rehearing, they assert that *Beltran, supra,* 56 Cal.4th 935 holds the erroneous failure to correctly instruct on heat of passion voluntary manslaughter in a murder case is state law error reviewable for prejudice under *People v. Watson*, *supra,* 46 Cal.2d 818.  *Beltran* is inapposite.  There*,* the Supreme Court held an instruction charging the jury to consider how an ordinary person "would react in the same situation knowing the same facts" was not ambiguous.  (*Beltran,* at p. 954.)  The problem, rather, was that the parties' closing

1

arguments seemed to champion inconsistent formulations of the standard for provocation sufficient to reduce murder to manslaughter.  It was the potential effect of those competing formulations, not a failure to instruct (or to instruct correctly) on the elements of murder, that the court assessed for prejudice under the *Watson* standard.  (*Id.* at pp. 944–945.)  *Beltran*, therefore, does not provide the relevant standard when the error, as here, is one of failure to adequately instruct the jury on the element of malice.

Nor, for present purposes, does *People v. Breverman*, *supra,* 19 Cal.4th 142 answer that question.  *Breverman* holds that a failure to instruct sua sponte on voluntary manslaughter as a lesser necessarily included offense is reviewed under *Watson* because, primarily, "the sua sponte duty to instruct fully on all lesser included offenses suggested by the evidence arises from California law alone."  (*Breverman,* at p. 149.)  But this case concerns the court's duty to give a requested instruction, not the sua sponte duty to instruct at issue in *Breverman*.  In any event, the legal classification of heat of passion manslaughter as a lesser included offense of murder does not end the analysis.  Heat of passion manslaughter is a lesser included offense of murder, facts permitting, *because it negates the element of malice*.  (*Rios, supra,* 23 Cal.4th at pp. 454, 461.)  If provocation is properly presented in a murder case, then, proving the element of malice requires the People to prove the absence of provocation beyond a reasonable doubt.  (*Id.* at p. 462.)  "[J]ury instructions relieving the prosecution of the burden of proving beyond a reasonable doubt each element of the charged offense violate the defendant's due process rights under the federal Constitution."  (*People v. Flood, supra,* 18 Cal.4th at. p. 491.)  Failure to instruct the jury on heat of passion to negate malice is federal constitutional error requiring analysis for prejudice under *Chapman.*

The petition for rehearing is denied.  There is no change in the judgment.

Dated: _____P.J

2

Trial Court:                                    Alameda County Superior Court


Trial Judge:                                    Honorable Cecilia P. Castellanos


Counsel for Defendant and Appellant:            FIRST DISTRICT APPELLATE
    Jamie Thomas                                PROJECT

                                                Jeffrey Alan Glick


Counsel for Plaintiff and Respondent:           Kamala D. Harris, Attorney General
    The People                                  Dane R. Gillette, Chief Assistant
                                                Attorney General
                                                Gerald A. Engler, Senior Assistant
                                                Attorney General
                                                Catherine A. Rivlin, Supervising Deputy
                                                Attorney General
                                                Michael Chamberlain, Deputy Attorney
                                                General

*People v. Thomas*, A129933
*In Re Thomas*, A136593

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JAMIE THOMAS,<br><br>    Defendant and Appellant. | A129933<br><br>(Alameda County<br>Super. Ct. No. C158950) |
| In re JAMIE THOMAS,<br><br>    On Habeas Corpus | A136593 |

In May 2012, this court decided that Defendant Jamie Thomas was properly convicted of second degree murder. In reaching our conclusion, we rejected Thomas's claims that the prosecution excluded potential jurors on the basis of their race and that the court erred when it admitted certain evidence of rap lyrics authored by Thomas into evidence. We also held that the trial court's refusal to instruct the jury on provocation that could have reduced this murder to voluntary manslaughter was harmless error.

In deciding the instructional error was harmless, we applied the standard for review of error articulated by our Supreme Court in *People v. Watson* (1956) 46 Cal.2d 818, 836, as applied to a failure to instruct on provocation in *People v. Breverman* (1998) 19 Cal.4th 142, 177-178, and *People v. Moye* (2009) 47 Cal.4th 537, 556. That is, we reviewed the record to determine whether it was reasonably probable that Thomas would have been convicted of manslaughter had the error not occurred. We concluded it was not.

1

But the application of the *Watson* harmless error standard in this case was subject to an important caveat. Although the court applied the *Watson* test in *Breverman* and *Moye*, the defendants in those cases never argued the instructions were deficient under federal law. (*People v. Moye, supra,* 47 Cal.4th at p. 666, fn.5.) Thomas made that argument.

On August 29, 2012, our Supreme Court granted Thomas's petition for review, and transferred his case back to this court "with directions to address defendant's contention that the trial court's refusal to instruct on heat of passion voluntary manslaughter constituted federal constitutional error." (Order filed August 29, 2012.) For the reasons that follow, we conclude that the failure to instruct the jury on the potential effect of provocation to negate malice aforethought was federal constitutional error. Because the jury was not instructed that it could consider provocation to reduce a murder to manslaughter, we apply the test articulated in *Chapman v. California* (1967) 386 U.S. 18, 24, and we conclude under that test the error was prejudicial. Thus, we reverse.

On remand, the People shall have the option of retrying Thomas for murder. If the People choose not to retry Thomas for murder, the judgment will be modified to reflect his conviction of voluntary manslaughter enhanced for his use of a firearm. Thomas has also filed a petition for writ of habeas corpus that we have consolidated for disposition with the remanded appeal from the Supreme Court. In light of our reversal, we dismiss the habeas corpus petition as moot.

## FACTUAL AND PROCEDURAL BACKGROUND

Thomas and his father lived in the same apartment complex at 71 Pearl Street in Oakland as did the victim, Sam Navarro, and his wife Araceli Gamez.[1] The trial testimony presented a background of disputes concerning parking on the premises.

On approximately four occasions, Thomas had parked his car in a manner that blocked Gamez's car. On all except one occasion, Gamez would wait for him to leave

---

[1] Gamez and Navarro were not legally married, but Gamez testified that they had been a couple for six years and that she considered him to be her common law husband.

rather than confront him. On that occasion, Gamez knocked on Thomas's door and asked the person who answered to move the car. After four or five minutes, someone came downstairs and did so. Navarro had also been blocked in several times, and Gamez had seen him go upstairs to talk to Thomas or his father about it.

The apartment manager, Sergio Torres, testified he was friends with Navarro and helped him get an apartment at 71 Pearl Street. He testified that visitors to the apartments often parked in the spaces designated for other residents and that this had caused problems.

Ignacio Ortiz testified that he and Navarro were close friends. On January 8, 2007, Ignacio and his brother Jose[2] drove to 71 Pearl Street because Ignacio was moving into an apartment there and planned to paint it. The two men arrived around six o'clock p.m. Jose and Navarro went to a store to get supplies while Ignacio painted. When the two men returned, it was dark outside. They parked Jose's truck in the space it had been in earlier. A station wagon pulled in immediately behind them. Thomas got out of the station wagon and Jose and Navarro exited the truck. Ignacio was standing in the doorway of the apartment and heard Navarro and Thomas arguing. Navarro told Thomas that he "had to move his car, that it wasn't the first time. He already told him that so many times about the parking spot, coming in and parking the car there . . . ." Navarro, sounding upset and angry, told Thomas "Motherfucker, you got to move your car." Thomas responded "Fuck off" and told Navarro to move the truck. Ignacio walked closer to the apartment stairs. Jose told Navarro, "Sam, leave that alone, man. It's cool for me. We can handle it later on." Jose began climbing the stairs.

Ignacio described the argument as "pretty heated." Both men were using profanity but there was no pushing or physical interaction. When they reached the top of the stairs, Ignacio addressed Navarro in Spanish, "telling him to leave that alone. We can unload the truck later on. And that was when [Thomas] turned around and said: 'What the fuck

---

[2] Because the Ortiz brothers share a last name, we identify them by first name, intending no disrespect.

3

you say?' " Ignacio told Thomas, "he's telling you [to] move the car, man. Just move the car." Thomas responded, "Fuck y'all."

According to Ignacio, Thomas was close enough to touch him and said, "What's up?" Ignacio believed this was a challenge to fight. Thomas then swung at Ignacio's face with his right hand. Ignacio ducked and "went for his legs, picked him up, body slammed him, and gave him a couple punches." Thomas's cell phone and keys fell from his pocket. Thomas began crying, then yelled, "you got me. It's cool. It's good." Ignacio then stopped hitting him. He told Thomas to pick up his phone and keys and to "get the fuck out of here and get that car out." Thomas got up, retrieved his keys and cell phone, and left. None of the remaining three men attempted to follow him.

Ignacio saw Thomas go to his car, open the driver's side, reach under the seat and retrieve something. He was yelling for a woman in one of the apartments. She came out and Thomas told her to call his father. The woman returned to the apartment and a moment later Thomas's father came out of a different apartment. Thomas's father began speaking with Navarro. Neither Navarro nor the Ortiz brothers were armed. Navarro told Thomas's father, "Hey man, you got to talk to your son. You know, my friend over here, he's whipped his ass over the parking lot. I already talked to him. I told him about the parking a few times. He just don't listen." Thomas's father told Navarro he would "take care of it."

Thomas's father approached Thomas in the parking lot and spoke with him for approximately one minute. Navarro followed Thomas's father into the parking lot. Ignacio tried to dissuade Navarro from going but Navarro told him, "he's good. The dad is already here. He's going to talk to him. Let me talk to him." Ignacio heard Navarro say, "Hey man. I just told you to move the car. You don't need to behave like that." Navarro and Thomas's father appeared to be calm, but Thomas appeared upset. Ignacio heard Thomas's father say, "Son, don't do it." He heard Thomas say "I'm going to get this motherfucker." Thomas then pushed his father against the car with his left hand and Ignacio saw a flash and heard a loud bang. Ignacio estimated that Navarro was two feet from Thomas when Thomas shot him.

4

Ignacio testified that Navarro did not lunge at Thomas or say anything to him. He testified that Navarro "was very, very calm." After Thomas shot Navarro, Jose ran towards the street and Ignacio ran into Navarro's apartment and called 911. He told the operator there had been two shots even though he only heard one "I guess because I was nervous. I wanted the police to get there as soon as possible."

Ignacio did not tell the 911 operator or the police on the night of the shooting that he had punched Thomas. He likewise did not tell the homicide detectives about his assault on Thomas that preceded the shooting. The first three times Ignacio met with the prosecutor, he said that there had not been a fight. At the preliminary hearing, he testified that he never touched Thomas. At trial he testified that he had lied "because at a certain point I felt that it was, I was responsible for Sammy's death, and [¶] . . . [¶] I didn't want the family to know that because of a nonsense fight, Sammy got killed." The prosecutor asked him in one of those meetings whether Thomas had said, "fuck these Mexicans" before he shot, and Ignacio had told the prosecutor that he did. At trial he testified that was also a lie. He testified that Thomas's actual statement was "I'm going to get this motherfucker."

The prosecution presented two other witnesses to the events of that evening. One of Navarro's neighbors, Mario Neal , testified that the evening of the confrontation he heard loud voices outside. He went outside and saw Navarro sitting on the steps with his two friends nearby. Navarro told him "they're tripping off of the parking." Navarro seemed upset but not angry, and he did not have any apparent scratches or other wounds. Neal saw as many as 10 people standing in the parking lot. Neal returned to his apartment and about five minutes later heard "some type of tussle. I hear some running upstairs. You know, I hear more commotion." Neal looked out of his window and saw Thomas "pacing" in the parking lot but did not see anyone else. Thomas looked like he was in a scuffle, but did not appear to have any major injuries. Neal's girlfriend told him to close the shades and stop looking, and he did so. "[N]o sooner than five more minutes" later he heard a gunshot. When he exited the apartment a short time later, he saw Navarro lying in the parking lot.

5

Kim Harris testified that although he is not related by blood to Thomas, he calls Thomas his nephew and Thomas refers to him as "uncle." He has known Thomas since he was nine years old. Harris is close friends with Thomas's father. He was at the apartment complex on the night of the shooting visiting friends with whom he was drinking and using cocaine. A young woman who Harris knew to be a friend of Thomas came to the apartment door, and Harris and Thomas's father went downstairs because they were concerned for Thomas's safety. At the bottom of the stairs, Harris saw two Hispanic men. Thomas was pointing at his face and asking the two older men to look at it. He seemed angry, but he was not hollering or shouting. Thomas's father was trying to calm him down. Thomas's face was red and a little swollen and Harris could smell alcohol on his breath, but Thomas did not seem drunk.

Harris testified that Navarro seemed apologetic. Thomas did not appear to respond to Navarro's apology, but said something to Navarro about stopping the other men's behavior. Navarro was not threatening and did not appear to be trying to attack anyone. Navarro continued to apologize for a minute or two when Harris heard a pop, but did not see Thomas shoot Navarro.

Thomas presented a version of events differing starkly from that testified to by Ignacio. He testified that he had a cordial relationship with Navarro. They did not argue and had no physical fights. Navarro never told Thomas to move his car and Thomas never asked Navarro to move his. He often had problems finding a place to park in the parking lot, although he was assigned stall number nine.

Thomas's wife was approximately eight months pregnant shortly before the shooting, and Thomas would sometimes use his father's parking space, stall 10, because "[n]ine was a tight [fit] and a lot of times I couldn't get out because of [eight] being parked behind me and number 10 being parked in front of me." Thomas was concerned that his wife would soon deliver the baby and he would not be able to get the car out. Space 10 was also difficult to get in and out of, however, because there was a tree stump in the space that blocked the exit if another car was parked too closely behind Thomas's. Thomas testified that he never fought with anyone over the parking issues but if someone

6

was parked in his spot he "would just kind of pull up and honk the horn."  When he did that, the person would come out and move their car.

When Thomas first moved into the apartment on Pearl Street, he did not own a gun. After he and his wife moved in, she got a "deer rifle" from her grandfather who had recently died.  Thomas purchased an SKS assault rifle after moving in although it was illegal for him to do so as a convicted felon.  He testified that he "was just being overprotective. I was thinking about my family.  We had a baby coming . . . ." Thomas's wife asked him to return the gun.  Thomas attempted to do so, but the man he purchased it from would not refund his money.  Thomas "called a few gun shops" in an attempt to sell it.  The gun shops would not purchase the rifle because it was not registered.  He testified that no bullets came with the gun and that he purchased bullets and loaded the gun in order to sell it.  "A lot of it has to do with stupidity, but also I'm a salesman.  Just from . . . working at the flea markets, I buy a lamp or come across a lamp, before I sell it I buy a light bulb or put it in or, you know, things of that sort.  So I just wanted it to be, all the accessories to be there . . . [¶] [W]hen I sold it."

Thomas cleaned and loaded the rifle on December 14. Prior to that date, he stored it in the apartment but then he put the loaded rifle in his car.  "We just thought it was safer to have it in the car.  My kids don't play in the car.  They play in the house.  And the gun was rather big, so it wasn't really nowhere to keep it." [*Sic*.]  He says he put it in the back of his car underneath the rear carpet where the spare tire was stored.  He did not move or touch the rifle again until January 8, 2007.

Thomas's daughter was born on January 3.  His wife and daughter stayed in the hospital for a few days.  On January 8, Thomas and his wife took the baby to see the doctor and then planned to go home.  They stopped at Thomas's grandmother's house, where they met Thomas's sister and mother and "a lot of people from my family."  The family convinced them to stay at the grandmother's house.  Thomas was frustrated because "[p]rior to my daughter coming home, I had . . . scrubbed my house from top to bottom. . . . [¶ So it was, like, I put in all that hard work and all that for nothing because

7

now we're keeping her at my grandmother's house." Thomas returned to the apartment on Pearl Street to get clothes for the next few days.

When he arrived he "pulled into the slot number 10. There was a truck that was parked near the back fence back there, and I couldn't quite fit in so I just fit in as best as I could." He left the car and began walking to the stairs but was stopped by Ignacio, who was in the passenger seat of the truck. Ignacio got out of the truck and told Thomas that "they were about to leave and if I could just move my car." Thomas did so, backing all the way out of the driveway because every parking spot was taken and he could not turn around. The exchange with Ignacio "was fine." Thomas backed out of the driveway and waited for the truck to pull out. He waited two or three minutes, but the truck did not move. Thomas honked his horn and waited. After a short time, Thomas saw that "[t]hey were still just kind of sitting there, so I just decided just to pull back in."

Thomas parked and walked through the parking lot to his apartment. He ran up the stairs but was stopped by Navarro who was standing in the middle of the stairs with his arms folded. Thomas asked Navarro if he knew the men in the truck. Navarro told Thomas "[y]ou don't want to fuck with them." Ignacio and Jose came up the stairs and Ignacio said, "I thought I told you to move your car." Thomas said, "I did just move my car. Why didn't you leave?" Jose answered that he had been on the phone. Thomas testified, "I just kind of looked at them because I didn't know if he expected me to just wait in the middle of the street while he talked on his phone. So I just kind of looked at him . . . ." Thomas told Jose, "I was just about to run upstairs and grab a few items and I was about to come back down. If they could just try to pull their car out . . . if they couldn't get out that I would go back down and move my car again." Thomas believed they could move the truck without him moving his car, however. Ignacio replied, "You know, man, you need to move your fucking car right now." Jose told Ignacio to calm down. Jose told Thomas that "if I didn't move my car, he was just going to ram it on his way out." Thomas asked who the men were and whether they lived in the apartments. The men did not answer. Thomas told them that if they were visitors they were supposed to park on the street.

8

"I let them know, again, I'm on my way up and about to grab a few items.  I made sure there was enough room for you guys to pull out.  So either you guys can try to pull out, and if you can't get out, I'll come back down there and I'll move my car or I'm going to go upstairs and you guys can wait."  Ignacio responded, "You need to move that fucking car right now."  Thomas told them "either you guys going to move the car, or I can just go upstairs and call the tow truck and have it towed out of here."  Ignacio asked, "So you're not going to move your car?"  Thomas told him he was not.  Thomas felt that Ignacio "was being real aggressive," and felt that he was in the right because he lived there.

Ignacio hit Thomas in the face.  Thomas dropped the things he was holding and began hitting Ignacio back.  Jose jumped into the fight and also hit Thomas.  Thomas was trying to get away because he was outnumbered.  "I eventually got a good distance from him to where we wasn't exactly at arm's reach, and somebody hit me from behind."  Thomas assumed it was Navarro.  Thomas fell to the ground and someone began kicking him.  Thomas covered his head and "balled up basically."  Thomas yelled for his father.  After being beaten for approximately a half minute, one of the men said to Thomas, "So you're going to move your car right now. Right?"  Thomas answered, "yes" but did not move because he was afraid to uncover his face.  He yelled for his father again, and Ignacio grabbed him by his shirt, pulled him up and told him to "shut up."  Ignacio pulled Thomas to his car and "told me to get in the car and fucking move it."  Thomas had dropped his keys during the confrontation and at that point did not have them.

Ignacio told him to get in his car and leave, but Thomas could not because he did not have the keys.  Instead, he reached into the back of the car and got his rifle.  Thomas aimed the gun at Ignacio "and I told him to leave me alone."  He didn't intend to shoot Ignacio, only to scare him.  Ignacio was only a few feet away.  Ignacio ran back toward the stairs and behind Jose and Navarro. Thomas still did not feel he could get away because the men were standing at the top of the stairs and Thomas did not have his car keys.  Thomas stood there holding the weapon at his side and called for his father.

9

After hitting Thomas on the head, Navarro had not intervened in the fight and did not tell Thomas to move his car. Thomas testified that he did not demand that he be permitted to enter his apartment because "I just didn't feel that would be the safest thing for me to do, despite the gun. [¶] I was scared. I was nervous. I wasn't thinking clearly at the time, and I just thought it would be best if I stay behind that car and wait for help." Thomas continued to yell for his father and his father came down the stairs one or two minutes after Thomas first pointed his rifle at Ignacio. His father stopped about three feet from Thomas's car and Thomas told him that Navarro had beaten him. Navarro began walking towards him and Thomas "told [his] dad to tell him don't come over here." Thomas also said directly to Navarro, "Sam, don't come over here." Navarro proceeded across the parking lot and blocked Thomas between his car and the fence. Navarro said, "I told you not to fuck with my homeboys. You should have moved your car. You think you're tough," in an aggressive tone. Navarro was trying to get around Thomas's father. Thomas told Navarro "just leave me alone" and asked him not to come closer, but Navarro stepped around Thomas's father. Thomas was holding the rifle in his left hand and testified that he did not push his father. Navarro was approximately four feet from Thomas and lunged toward him, reaching out with one hand. Thomas pulled the trigger.

Thomas testified that he did not make a conscious decision to pull the trigger and that he did not intend to fire a shot. He was afraid of being injured or killed and felt he had no choice but to shoot. He was not thinking clearly about his options when he shot because "I was afraid. I was nervous. I just wasn't thinking clearly. I told him to leave. I told him to back up. I told him to just leave me alone. My dad asked him to leave me alone and he wouldn't. I don't know." Thomas testified that he was holding the gun level. Navarro "was crouched forward, bent at the waist as if he was reaching for something." Thomas believed he was reaching for the gun. After he shot Navarro, he left 71 Pearl Street with his father. He spent the night at the house of a friend of his father and the next morning his father told him he "needed to get away." Thomas went to Modesto and stayed with another friend of his father. Eventually he went to South Carolina because his father and wife "felt that just me being in California alone wasn't

10

good enough." He did not believe that turning himself in "would be the wisest thing for me to do." However, after some time he returned from South Carolina and was arrested.

Dr. Thomas Rogers, a forensic pathologist, testified that he performed an autopsy on Navarro's body. Navarro had no bruises on his body and no cuts or scrapes on his hands. He observed a gunshot entrance wound on the right side of Navarro's chest "about six and a half inches below and about four inches to the side of the top of the breastbone." The exit wound was located on the left back, approximately 11 inches below "the bump at the base of your neck." From the examination, Rogers was able to determine that "the bullet entered in the right front side of the chest and its basic direction is that it was going towards the back of the body. It was going down towards the feet at about approximately a 35-degree angle, and it was going towards the left side of the body at approximately a 40-degree angle." Rogers testified that the entrance wound was oval-shaped and that the shape "may mean that the bullet is coming in not straight on, but let's say, at an angle." But he could not determine the victim's position when he was shot from the path of the bullet. He could have been in any of an infinite number of positions, including turning away from the bullet.

Rogers noticed stippling at the site of the entrance wound. He described stippling as burned and unburned particles of gun powder that strike the skin and leave "little period-sized defects on the skin." He testified that stippling is the result of a close-range shot, and that if the victim were reaching toward the barrel of the gun when it was shot "it is possible that some stippling can be deposited on the hands. That does happen." However, he also testified that there might not be stippling and he could not say based on the absence of stippling whether a victim was reaching toward the gun when it was shot. Nor did the absence of bruising on his hands exclude the possibility that he had punched someone shortly before he was killed.

Thomas was charged by information with one count of murder (Pen. Code § 187, subd. (a))[3] with an allegation that he personally discharged a firearm and caused great

_____

[3] All further statutory references are to the Penal Code unless otherwise indicated.

11

bodily injury (§§ 12022.7, subd. (a), 12022.5, subd. (a) and 12022.53, subds. (b), (c), and (d)), and one count of being a felon in possession of a firearm (§ 12021, subd. (a)(1)). The information additionally alleged that Thomas had one prior felony conviction and that he had served a prior prison term within the meaning of section 667.5, subdivision (b). The jury found Thomas guilty of second degree murder and of being a felon in possession of a firearm, and found the firearm enhancements true.

Thomas was sentenced to 40 years to life imprisonment, consisting of 15 years to life for the murder, and 25 years to life for the personal use of a firearm enhancement. The trial court imposed but stayed the sentence on the remaining firearm enhancements and imposed but stayed a two-year term for the felon in possession of a firearm conviction. The prosecutor dismissed the prior prison term enhancement. Thomas timely appealed.

## DISCUSSION

## I.

A mistaken instruction on malice as an element of murder is constitutional error that is reviewed for its prejudicial effect under the rule established in *Chapman v. California, supra,* 386 U.S. 18. (*People v. Swain* (1996) 12 Cal.4th 593, 607; accord. *People v. Flood* (1998) 18 Cal.4th 470, 502-503.) That is, in such cases we consider whether it appears beyond a reasonable doubt that the asserted error did not contribute to the verdict. (*People v. Swain, supra.* 12 Cal.4th at p. 607.) The principal question we will address in this opinion is whether the failure to instruct on provocation or heat of passion as it bears on the culpability for homicide, where warranted by the evidence, results in an erroneous jury charge on an element of murder, or some lesser error. For the reasons that follow, we conclude the failure to instruct on provocation where warranted is an error of federal constitutional dimension that denies the defendant due process because it relieves the prosecution of the burden to prove malice beyond a reasonable doubt. Furthermore, when we examine the failure to instruct on provocation in this case, we conclude the error was prejudicial and Thomas's conviction for second degree murder must be reversed.

12

## A. Provocation

While the legislature may limit the mental elements included in the statutory definition of a crime (*People v. Saille* (1991) 54 Cal.3d 1103, 1116), California law defines murder as "the unlawful killing of a human being, or a fetus, with malice aforethought." (§ 187, subd. (a).) Malice may be expressed or implied. (§ 188.) Express malice is an intent to kill, while implied malice is shown by a willful act with natural and probable consequences that are dangerous to human life, where the actor knowingly acts with conscious disregard for the danger to life that is inherent in the act. (*People v. Beltran* (2013) 56 Cal.4th 935, 941-942.) A killing with express malice that is willful, deliberate and premeditated is first degree murder. (*Id.* at p. 942.) Second degree murder is an unlawful killing with malice aforethought, but without the elements of willfulness, premeditation or deliberation that would support a first degree murder. (*Ibid.*)

"Manslaughter is a lesser included offense of murder. (§ 192; *People v. Thomas* (2012) 53 Cal.4th 771, 813.) The mens rea element required for murder is a state of mind constituting either express or implied malice. A person who kills without malice does not commit murder. Heat of passion is a mental state that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter. Heat of passion arises if, ' "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." ' " (*People v. Barton* (1995) 12 Cal.4th 186, 201.) "Heat of passion, then, is a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation. While some measure of thought is required to form either an intent to kill or a conscious disregard for human life, a person who acts without reflection in response to adequate provocation does not act with malice." (*People v. Beltran, supra,* 56 Cal.4th at p. 942.)

In a homicide case, the trial court has a sua sponte duty to instruct on voluntary manslaughter as a lesser included offense of murder whenever there is evidence from

which a reasonable jury could conclude that a manslaughter, but not a murder, was committed. (*People v. Breverman, supra,* 19 Cal.4th at p. 162.) This duty includes instruction on voluntary manslaughter due to a sudden quarrel or heat of passion when there is substantial evidence that shows such a theory is relevant. (*Id.* at p. 154-155.) And it may apply even in cases when the defendant intended to kill. (*Id.* at p. 163.) But when manslaughter and murder are considered in the same case, provocation and sudden quarrel are not elements of voluntary manslaughter. (*People v. Rios* (2000) 23 Cal.4th 450, 462.) Rather, sufficient provocation and sudden quarrel present mitigating circumstances that may afford a defendant "partial exculpation" for murder that results in a conviction for manslaughter. As explained by our Supreme Court, sufficient provocation either negates the element of malice required for murder or causes it to be disregarded as a matter of law. (*People v. Beltran, supra,* 56 Cal.4th at p. 942; *People v. Bryant* (2013) 56 Cal.4th 959, 968; see also, *People v. Moye, supra,* 47 Cal.4th at p. 549.)

When malice is an element of murder and heat of passion or sudden provocation is put in issue, the federal due process clause requires the prosecution to prove its absence beyond a reasonable doubt. (*Mullaney v. Wilbur* (1975) 421 U.S. 684, 704.) Thus, in California, when a defendant puts provocation in issue by some showing that is sufficient to raise a reasonable doubt whether a murder was committed, it is incumbent on the prosecution to prove malice beyond a reasonable doubt by proving that sufficient provocation was lacking. (*People v. Rios, supra.* 23 Cal.4th at p. 461-462 [citing *Mullaney*].) *Mullaney* compels the conclusion that failing to so instruct the jury is an error of federal constitutional dimension. (Cf. *Patterson v. New York* (1977) 432 U.S. 197.)

### B. The Court Was Required to Instruct on Provocation

Here, Thomas requested the court to instruct with CALCRIM 570 that informs the jury a killing that would otherwise be murder is reduced to voluntary manslaughter if the

defendant killed someone because of a sudden quarrel or in the heat of passion.[4] The court refused to instruct on this theory on the basis that the evidence of a sudden quarrel or heat of passion was not substantial enough to merit consideration by the jury. Neither did the court deliver, nor Thomas request, the pinpoint instruction in CALCRIM 522 that would permit the jury to reduce murder from the first to the second degree if the defendant was provoked. Instead, the court instructed on murder, voluntary manslaughter due to imperfect self-defense, and the legally exonerating effect of actual self defense.

---

[4] CALCRIM 570 states: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion.

The defendant killed someone because of a sudden quarrel or in the heat of passion if:

1[.] The defendant was provoked;

2[.] As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured (his/her) reasoning or judgment;

AND

3[.] The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment.

Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection.

In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time.

It is not enough that the defendant simply was provoked. The defendant is not allowed to set up (his/her) own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment.

[If enough time passed between the provocation and the killing for a person of average disposition to "cool off" and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis.]

The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder."

15

We cannot agree with the trial court that voluntary manslaughter due to a sudden quarrel or heat of passion was unsupported by the evidence introduced at trial. All the witnesses agree that minutes before he killed Navarro, Thomas had been involved in an argument and physical altercation with the Ortiz brothers and Navarro. Ignacio Ortiz described the argument as "pretty heated," and another witness characterized the event leading up to the shooting as a tussle and commotion. The Ortiz brothers and Navarro got the better of Thomas, and various accounts have him crying, calling out for his father or being dragged across the apartment parking lot. Shortly before the shooting, Thomas was seen pacing in the parking lot and he seemed angry. Once he retrieved the assault weapon from his car, his father was trying to calm him down. That is when Navarro approached. Thomas says Navarro lunged at him, and he pulled the trigger. Thomas thought Navarro was going for the gun, and said he did not intend to fire. He fired because he was afraid, nervous and not thinking clearly. Although these facts may fit more precisely with a homicide mitigated by imperfect self-defense, we cannot rule out that they may also show that Thomas was guilty only of voluntary manslaughter because when he shot Navarro his passion was aroused and his reason was obscured due to a sudden quarrel. (*People v. Beltran, supra,* 56 Cal.4th at p. 942.)

Neither Thomas's claim that he unintentionally pulled the trigger nor the fact that most of his testimony was self-serving obviated the need for the CALCRIM 570 instruction. (*People v. Barton, supra,* 12 Cal.4th at pp. 201-202; see also *People v. Carmen* (1951) 36 Cal.2d 768, 773 [defendant entitled to instruction based on theory of his testimony no matter how implausible].) In light of the evidence, the obvious deficiency in the instructions given by the court is that they are bereft of any indication that the jury could consider Thomas's emotional excitement as a factor that could reduce his criminal culpability. The jury should have been instructed under CALCRIM 570 that a killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone due to a sudden quarrel or heat of passion. Although not requested, it also seems the jury should have been instructed under CALCRIM 522 that heat of passion could reduce the degree of murder.

16

## C. The Omission Was Not Harmless Beyond a Reasonable Doubt

In our earlier opinion, we followed *People v. Breverman, supra,* 19 Cal.4th 142, and analyzed the omission in the court's instructions as an error of state law. We applied the California standard for harmless error articulated in *People v. Watson, supra,* 46 Cal.2d 818, which asks us to determine whether it is reasonably probable Thomas would have received a more favorable verdict if the jury was properly instructed. Under that standard, we concluded the second degree murder verdict would have been the same even if the jury were properly instructed on provocation.[5]

Now, things are different. In light of our conclusion that the court's failure to instruct on provocation was federal constitutional error (*infra* at pp. 2, 14), we cannot conclude the error was harmless. While the jury may have gotten it right in convicting Thomas of second degree murder, especially if the court were to instruct with both CALCRIM 522 and 570, we cannot be certain.

We may affirm the verdict "if, but only if, it appears beyond a reasonable doubt that the error did not contribute to the particular verdict at issue." (*People v. Sakaris* (2000) 22 Cal.4th 596, 625.) The altercation between Thomas and Navarro and his friends was a significant focus of the trial testimony. Thomas was beat up and minutes later shot Navarro when he says Navarro was rapidly advancing on him and had pushed Thomas's father aside. The jury was allowed to consider whether Thomas shot Navarro in actual or mistaken self-defense. But nothing in the court's instructions advised the jury it could consider whether Thomas's passion was aroused or his reason obscured on account of the altercation. We cannot conclude beyond a reasonable doubt the omission in the jury instructions did not affect the verdict of second degree murder.

## II.

The gravamen of Thomas's appeal and his petition for writ of habeas corpus seek reversal of his conviction for second degree murder on the basis that the evidence and proper instructions to the jury would warrant a verdict of voluntary manslaughter based

---

[5] Justice Pollak dissented and concluded the error was prejudicial under the *Watson* standard.

on sudden quarrel or provocation. Thomas makes no claim in these proceedings that he is factually innocent, nor can he in light of the evidence, and the jury rejected the exonerating possibility of self-defense. In the absence of re-trial on the murder charge, the record in this case establishes Thomas's guilt of voluntary manslaughter as a matter of law.

"An appellate court is not restricted to the remedies of affirming or reversing a judgment. Where the prejudicial error goes only to the degree of the offense for which the defendant was convicted, the appellate court may reduce the conviction to a lesser degree and affirm the judgment as modified, thereby obviating the necessity for a retrial." (*People v. Edwards* (1985) 39 Cal.3d 107, 118; § 1260.) Thus, our disposition shall afford the People the option of re-trying Thomas for murder or accepting a modification to the judgment to reflect Thomas's conviction for voluntary manslaughter. In the event the judgment is modified, the trial court will be afforded the opportunity to re-sentence Thomas in light of the modification to the judgment.

## DISPOSITION

Thomas's conviction for second degree murder is reversed. The People shall have 60 days from issuance of the remittitur to determine whether to retry Thomas for murder. If the People fail to re-file murder charges within 60 days of issuance of the remittitur, the judgment shall be modified to reflect Thomas's conviction for voluntary manslaughter instead of second degree murder, and as modified the judgment is affirmed. In the event the judgment is modified the trial court shall take into account Thomas's use of a firearm and prior service in state prison as alleged in the information and proven at trial when he is sentenced for voluntary manslaughter. Thomas's petition for a writ of habeas corpus is dismissed as moot.

_____

Siggins, J.

We concur:


_____

McGuiness, P.J.


_____

Pollak, J.

Trial Court: Alameda County Superior Court

Trial Judge: Honorable Cecilia P. Castellanos

Counsel for Defendant and Appellant: FIRST DISTRICT APPELLATE
    Jamie Thomas PROJECT

Jeffrey Alan Glick

Counsel for Plaintiff and Respondent: Kamala D. Harris, Attorney General
    The People Dane R. Gillette, Chief Assistant
Attorney General
Gerald A. Engler, Senior Assistant
Attorney General
Catherine A. Rivlin, Supervising Deputy
Attorney General
Michael Chamberlain, Deputy Attorney
General

*People v. Thomas*, A129933
*In Re Thomas*, A136593