Filed 3/5/15  P. v. Salguero CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CYNTHIA E. SALGUERO,<br><br>    Defendant and Appellant. | B254320<br><br>(Los Angeles County<br>Super. Ct. No. BA342929) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Jose I. Sandoval, Judge.  Affirmed.

Sharon M. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., Supervising Deputy Attorney General, Allison H. Chung, Deputy Attorney General, for Plaintiff and Respondent.

## INTRODUCTION

A jury convicted defendant and appellant Cynthia Salguero of second degree murder (Pen. Code, § 187, subd. (a)) and found true the allegation that a principal[1] was armed with a handgun in the commission of the offense (Pen. Code, § 12022, subd. (a)(1)). The trial court sentenced defendant to 16 years to life in state prison.

On appeal, defendant contends that the trial court erred in refusing to instruct the jury on voluntary manslaughter based on the theories of imperfect self-defense and imperfect defense of another, erred in refusing to instruct the jury on voluntary manslaughter based on the theory of heat of passion, abused its discretion in limiting defendant's testimony about the victim's abuse of defendant's sister, and erred in failing to instruct the jury that the prosecution had to prove the absence of provocation as an element of murder. Defendant further contends that the cumulative effect of the errors requires reversal. We affirm.

## BACKGROUND

Defendant lived at 623 East 83rd Street in Los Angeles. There was a second structure on the property and a garage that had been converted into a residence. Defendant lived in the front residence, and her half sister, Alma Montiel, lived in the converted garage. At times, Montiel's boyfriend, Renny Contreras Mendez, lived with Montiel.

About 10:45 p.m. on May 9, 2007, defendant called the police and spoke to Los Angeles Police Department Officer Christian Carrillo. Defendant said that her sister had called her and begged her to come over because Mendez was "beating her up." When defendant attempted to assist her sister, Mendez punched defendant in the face four times, knocking her to the ground. When defendant's father "came out," Mendez fled. Defendant suffered slight swelling to the left side of her face.

---

[1]    Boujour Smith was charged in the same information with defendant, but was tried separately.

2

At 10:11 p.m. on May 16, 2007, the police received a call reporting a shooting in the alley behind defendant's house. There, the police found Mendez who had been shot to death.

Over a year later, on June 30, 2008, Los Angeles Police Department Detective Colin Braudrick, who was working on a cold case unit in the criminal gang homicide division, and his partner, Frank Alvelais, interviewed defendant about Mendez's murder. Initially, defendant denied involvement in Mendez's murder before disclosing her role. Defendant said that she had a dispute with Mendez around May 7, 2007. Defendant had disrupted a fight between Mendez and Montiel, and Mendez struck and pushed defendant.

Defendant testified that she was "extremely upset" about the incident. She initially told the detective that she arranged with Smith to beat up Mendez. Later in the interview, defendant said that she wanted to have Mendez "taken care of" and had paid Smith $500 to do so. Defendant discussed with Smith when Mendez would be at "the location" and gave him a description of Mendez. On the day of Mendez's murder, defendant called Smith to discuss "their previous arrangements"—i.e., "ultimately to murder Mr. Mendez." The police arrested Smith on July 1, 2008.

On July 2, 2008, Detective Braudrick interviewed defendant. A recording of the interview was played for the jury. During the interview, defendant stated that she paid "Bo" a total of $500 to "do something to Renny." Asked what Bo was supposed to do to Renny, defendant responded, "Take care of him. Hurt him. Didn't matter. I mean I was very upset when I said it too." Defendant said, "I told him just to take care of him. Whatever. That's what we mentioned on that. I mean me and him took it, I guess, a literal way of 'get rid of him' or 'take care of him.' I don't know." Defendant said that she and Smith understood that she wanted to "get rid of Renny." Detective Braudrick asked defendant, "So you didn't want him to just beat Renny up is what you're saying?" Defendant responded, " I just told him to take care of him." Detective Broderick asked defendant what she meant by the phrase "get rid of him." Defendant responded, "To me it means get rid of him. It didn't matter to me how he was gonna do it or whatever. Just

3

get rid of him." Smith agreed to defendant's offer of $500. Defendant appears to have said that she paid Smith $250 in advance and $250 after "it" was done.

Detective Braudrick asked defendant if she had wanted to "get rid of him for good." Defendant replied, "I just told him like that whatever he was gonna do—whatever." Detective Braudrick asked defendant what she thought Smith was going to do. Detective Alvelais added, "He's a 'Swan' gang member. What did you think was gonna happen?" Defendant replied, "Pretty much what happened. What's 'transpiring.' . . . [¶]—[¶] Renny no longer here." Detective Braudrick asked defendant, "And why is he no longer here?" Defendant responded, "Because I told someone to take care of it."

Detective Alvelais asked defendant, "When you said 'take care of it' to a 'Swan' gang member, what did you mean?" Defendant responded, "I'm still * * * I'm not gonna say it. I'm sorry."[2] She continued, "I know what I meant. You know what I mean . . . ." Defendant said that she was "very upset" at the time and wanted Renny "to pay." Detective Braudrick asked defendant, "So you wanted him, then, to take care of Renny permanently." Defendant responded, "I just told him to take care of it." Detective Braudrick asked defendant, "[Y]ou said you wanted what happened to happen. And that's when you first paid him the money; right?" Defendant said, "Yes." Detective Braudrick asked defendant, "And what happened was that Renny was killed. Right?" Defendant answered, "Yes." Detective Braudrick asked defendant, "[I]s that what you wanted to happen?" Defendant replied, "I guess at the time when I said it and when I agreed to it, yes. Afterwards, of course, and when I—remorse and regret."

Detective Alvelais asked defendant, "Did you prior to this ever plan on with anybody else having somebody killed?' Defendant responded, "No." Detective Alvelais asked defendant, "Was this the first time?" Defendant responded, "Yes." Detective Braudrick asked defendant, "So you knew by the time they were finished taking care of Renny he wouldn't be living any more [*sic*]." Defendant responded, "Yes."

---

**2**      Asterisks denote parts of the recording that were unintelligible.

Defendant said that she knew Mendez was going to "be there" to pick up his "stuff" and she "made the call." Defendant believed "that it was gonna be more than just kicking Renny's ass" because she was "to that point where [she] was very upset that [she] knew that's what [she] wanted to be done with him." Detective Alvelais asked defendant, "How long afterwards—after he was killed did it take you for—to regret that you had arranged for him to be killed?" Defendant responded, "Instantly." She said she "acted on an impulse."

Testifying in her own behalf, defendant said that Mendez was very verbally and physically abusive, especially when he was under the influence of drugs. Defendant had witnessed his abuse numerous times. She had seen Mendez physically abuse Montiel. Defendant was a victim of domestic violence and wanted Mendez away from her and her sister. Mendez had returned to the property after defendant's report to the police.

Defendant testified that she and Smith attended junior high and continuation school together. She did not know that he was a Swan gang member. She had seen Smith with a gun when they were in high school. She denied paying Smith to kill Mendez. Instead, she said she paid Smith to "beat up" Mendez. She never wanted to have Mendez killed. She wanted to have him "removed or taken away from beating on [her] sister and [her] family members if he ever got to that, because he did hit [her]." Defendant wanted Renny beaten up just as he had beaten defendant's sister numerous times.

Defendant was unsure of when she made her "arrangement" with Smith. It could have been the day after Mendez assaulted defendant or "the third day or what have you." Defendant admitted that she had an opportunity to think about the "arrangement" she had with Smith and to weigh the consequences of hiring him. No one forced defendant to hire Smith, and she had the opportunity to withdraw from her agreement with him.

Prior to Mendez's killing, defendant paid Smith $250 through Dwayne Marshall, a mutual friend, apparently because Smith was, at the time, in jail. After Mendez's killing, defendant paid Smith another $250 to complete the arrangement she had with him. Defendant knew that Mendez had been murdered when she made the final payment.

5

Defendant testified that following her arrest, she was subject to a lengthy and exhausting interrogation. She was exhausted and wanted to sleep when she made the recorded statement that was played for the jury. Asked if her recorded answers were true or if she gave answers she felt she had to give, defendant responded, "At that moment, I felt that that's what they wanted to hear. And I felt I had to give them something—at some point something."

## DISCUSSION

**I.** **Voluntary Manslaughter Instruction Based on the Theories of Imperfect Self-Defense and Imperfect Defense of Another**

Defendant contends that the trial court erred in refusing to instruct the jury on voluntary manslaughter based on theories of imperfect self-defense and imperfect defense of another. The trial court did not err.

*A.* *Background*

Defendant requested the trial court to instruct the jury on voluntary manslaughter based on theories of self-defense and defense of another. Defense counsel argued that there was evidence that defendant paid the initial $250 to Smith through Marshall while Smith was in custody. From such evidence, defense counsel argued, the jury could infer that defendant's arrangement or conspiracy with Smith was initiated soon after the May 9 incident involving defendant, defendant's sister, and Mendez and thus there was sufficient, timely provocation. Addressing defense counsel's request, the trial court referred to the "immediacy" element required for voluntary manslaughter and paraphrased the relevant parts of CALCRIM No. 571[3] as follows: "The defendant

_____

[3] Unmodified, CALCRIM No. 571 provides:
"A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because (he/she) acted in (imperfect self-defense/ [or] imperfect defense of another).

"If you conclude the defendant acted in complete (self-defense/ [or] defense of another), (his/her) action was lawful and you must find (him/her) not guilty of any crime.

6

actually believed that he or someone else was in imminent danger of being killed or suffering great bodily injury, the defendant actually believed that immediate use of deadly force was necessary. . . .  [¶] . . . Belief in future harm is not sufficient no matter how great or how likely the harm would be."  The trial court stated that it was trying to reconcile defense counsel's characterization of the evidence with the elements of voluntary manslaughter.  Defense counsel submitted the request.  The trial court did not further address the request, but implicitly denied it when it did not instruct the jury with CALCRIM No. 571.

---

The difference between complete (self-defense/ [or] defense of another) and (imperfect self-defense/ [or] imperfect defense of another) depends on whether the defendant's belief in the need to use deadly force was reasonable.

"The defendant acted in (imperfect self-defense/ [or] imperfect defense of another) if:

"1  The defendant actually believed that (he/she/ [or] someone else/ *<insert name of third party>*) was in imminent danger of being killed or suffering great bodily injury;

"AND

"2  The defendant actually believed that the immediate use of deadly force was necessary to defend against the danger;

"BUT

"3  At least one of those beliefs was unreasonable.

"Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be.

"In evaluating the defendant's beliefs, consider all the circumstances as they were known and appeared to the defendant.

"[If you find that *<insert name of decedent/victim>* threatened or harmed the defendant [or others] in the past, you may consider that information in evaluating the defendant's beliefs.]

"[If you find that the defendant knew that *<insert name of decedent/victim>* had threatened or harmed others in the past, you may consider that information in evaluating the defendant's beliefs.]

"[If you find that the defendant received a threat from someone else that (he/she) reasonably associated with *<insert name of decedent/victim>*, you may consider that threat in evaluating the defendant's beliefs.]

"[*Great bodily injury* means significant or substantial physical injury.  It is an injury that is greater than minor or moderate harm.]

"The People have the burden of proving beyond a reasonable doubt that the defendant was not acting in (imperfect self-defense/ [or] imperfect defense of another).  If the People have not met this burden, you must find the defendant not guilty of murder."

## B.    Application of Relevant Principles

"'[I]t is the "court's duty to instruct the jury not only on the crime with which the defendant is charged, but also on any lesser offense that is both included in the offense charged and shown by the evidence to have been committed." [Citation.]' (*People v. Gutierrez* (2009) 45 Cal.4th 789, 826 [89 Cal.Rptr.3d 225, 200 P.3d 847]; see *Beck v. Alabama* (1980) 447 U.S. 625, 637 [65 L.Ed.2d 392, 100 S.Ct. 2382].) 'Conversely, even on request, the court "has no duty to instruct on any lesser offense unless there is substantial evidence to support such instruction" [Citation.]' ([*People v.*] *Cole* [(2004)] 33 Cal.4th [1158,] 1215.) Substantial evidence 'is not merely "*any* evidence . . . no matter how weak" [citation], but rather "'evidence from which a jury composed of reasonable [persons] could . . . conclude [ ]'" that the lesser offense, but not the greater, was committed. [Citations.]' (*People v. Cruz* (2008) 44 Cal.4th 636, 664 [80 Cal.Rptr.3d 126, 187 P.3d 970].) '"On appeal, we review independently the question whether the court failed to instruct on a lesser included offense." [Citation.]' (*People v. Avila* (2009) 46 Cal.4th 680, 705 [94 Cal.Rptr.3d 699, 208 P.3d 634].)" (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1327-1328.)

"'California statutes have long separated criminal homicide into two classes, the greater offense of murder and the lesser included offense of manslaughter. The distinguishing feature is that murder includes, but manslaughter lacks, the element of malice. (Compare § 187, subd. (a) ["[m]urder is the unlawful killing of a human being . . . with malice aforethought"] with § 192 ["[m]anslaughter is the unlawful killing of a human being without malice"].)' [¶] . . . [¶] 'Under the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because the defendant *actually,* but unreasonably, believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime greater than voluntary manslaughter.' [Citation.]" (*People v. Randle* (2005) 35 Cal.4th 987, 994-995, overruled on another point in *People v. Chun* (2009) 45 Cal.4th 1172, 1201; *People v. Lewis* (2001) 25 Cal.4th 610, 645 ["When the defendant killed in the actual but unreasonable belief that he or she was in imminent

8

danger of death or great bodily injury, this is termed 'imperfect self-defense,' and the killing is reduced from murder to voluntary manslaughter. [Citations.]"].) The defendant must "actually both possess and act upon the required state of mind." (*People v. Sinclair* (1998) 64 Cal.App.4th 1012, 1016.)

Discussing the "imminence" requirement for imperfect self-defense, the Supreme Court in *People v. Manriquez* (2005) 37 Cal.4th 547, 581 said, "'Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury. "'[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future. *An imminent peril is one that, from appearances, must be instantly dealt with.*'"'" Because the elements of voluntary manslaughter based on the theories of imperfect self-defense and imperfect defense of another are the same except for the person who was being defended (see CALCRIM No. 571), the discussion of the "imminence" requirement in *People v. Manriquez, supra,* applies with equal force in a case addressing imperfect defense of another.

Defendant contends that there was sufficient evidence to warrant a voluntary manslaughter instruction based on the theory of imperfect defense of another because she "testified that she had an honest belief that her sister's boyfriend, Renny Contreras [Mendez], would not leave her sister alone and that he would return to hurt her sister and/or herself or other members of her family if he was not stopped. . . . [Defendant]'s beliefs were based upon her personal observations and awareness of physical abuse of her sister by [Mendez], [Mendez]'s assault upon [defendant] and her sister on May 8, 2007, [*sic*] [Mendez]'s refusal to comply with Montiel's demands that he stay away, and upon [defendant]'s own experience with domestic violence."

The evidence adduced at trial showed, at most, that defendant had a fear of future harm to Montiel or her family members. That Mendez returned to Montiel's home after prior incidents of domestic violence may have caused defendant to believe that he would return after the May 9, 2007, incident—as he did—but such a belief concerned future conduct and thus did not pose an "immediate and present" peril that, "from appearance,

9

must be instantly dealt with." (See *People v. Manriquez, supra,* 37 Cal.4th at p. 581.) As discussed above, when the fear at issue is a fear of future harm, the defendant is not entitled to a voluntary manslaughter instruction based on the theory of imperfect defense of another regardless of how great the fear and/or how great the likelihood of the harm. (*Ibid.*) Accordingly, the trial court did not err in rejecting defendant's request to instruct the jury on voluntary manslaughter based on the theory of imperfect defense of another.

Although defendant asserts that the trial court erred in failing to give the jury a voluntary manslaughter instruction based on the theory of imperfect self-defense, defendant does not develop the argument. Nevertheless, that argument fails for the same reason that defendant's argument that the trial court erred in failing to give the jury a voluntary manslaughter instruction based on the theory of imperfect defense of another fails—i.e., there was no evidence that defendant believed that there was an imminent as opposed to a future threat of death or great bodily injury to herself. (*People v. Manriquez, supra,* 37 Cal.4th at p. 581.)

## II. Voluntary Manslaughter Instruction Based on the Theory of Heat of Passion

Defendant contends that the trial court erred in refusing to instruct the jury on voluntary manslaughter based on the theory of heat of passion. The trial court did not err.

Defendant contends that she requested an instruction on voluntary manslaughter based on the theory of heat of passion. In support of that contention, she cites that part of the record where defense counsel requested voluntary manslaughter instructions based on the theories of imperfect self-defense and imperfect defense of another. Defense counsel did not request a heat of passion voluntary manslaughter instruction. Notwithstanding defendant's failure to request an instruction on heat of passion voluntary manslaughter, the trial court was under a duty to give the jury such an instruction if it was supported by substantial evidence. (*People v. Castaneda, supra,* 51 Cal.4th at p. 1327.)

"[V]oluntary manslaughter based upon sudden quarrel or heat of passion requires a showing of adequate provocation, which has both a subjective and an objective component. (*People v. Steele* (2002) 27 Cal.4th 1230, 1252 [120 Cal.Rptr.2d 432, 47

10

P.3d 225].)  The defendant must actually and subjectively kill under the heat of passion, but the circumstances giving rise to the heat of passion are also viewed objectively to determine whether the "'circumstances were sufficient to arouse the passion of the ordinarily reasonable man.'" (*Id.* at pp. 1252-1253.)" (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 301.)

CALCRIM No. 570[4] provides, in pertinent part, that "[i]n order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the

_____

**4**      Unmodified, CALCRIM No. 570 provides:
"A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion.
"The defendant killed someone because of a sudden quarrel or in the heat of passion if:
"1  The defendant was provoked;
"2  As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured (his/her) reasoning or judgment;
"AND
"3  The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment. Heat of passion does not require anger, rage, or any specific emotion.  It can be any violent or intense emotion that causes a person to act without due deliberation and reflection.
"In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it.  While no specific type of provocation is required, slight or remote provocation is not sufficient.  Sufficient provocation may occur over a short or long period of time.
"It is not enough that the defendant simply was provoked.  The defendant is not allowed to set up (his/her) own standard of conduct.  You must decide whether the defendant was provoked and whether the provocation was sufficient.  In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment.
"[If enough time passed between the provocation and the killing for a person of average disposition to 'cool off' and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis.]
"The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion.  If the People have not met this burden, you must find the defendant not guilty of murder."

11

direct and immediate influence of provocation as . . . defined . . . ." It further provides that "[i]f enough time passed between the provocation and the killing for a person of average disposition to 'cool off' and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis." (*People v. Hach* (2009) 176 Cal.App.4th 1450, 1458-1459 [when sufficient time has elapsed between the provocation and the killing for passion to subside and reason to return, substantial evidence does not support a heat of passion voluntary manslaughter instruction]; *People v. Shade* (1986) 185 Cal.App.3d 711, 716.)

The evidence shows that defendant had sufficient time to cool off before Smith shot Mendez in the head or even before she hired Smith to do so. The incident in which Mendez abused defendant's sister and punched defendant in the face four times at Montiel's home took place on May 9, 2007. Defendant testified that she was unsure of when she made her "arrangement" with Smith—she could have hired him the day after Mendez assaulted defendant or "the third day or what have you." She admitted, however, that she had an opportunity to think about the "arrangement" she had with Smith and to weigh the consequences of hiring him. Smith killed Mendez on May 16, 2007, a week after the incident at Montiel's home. These periods of time were sufficient for a person of average disposition to cool off and to regain her clear reasoning and judgment. Accordingly, the trial court properly did not instruct on voluntary manslaughter based on the theory of heat of passion. (*People v. Hach, supra,* 176 Cal.App.4th at pp. 1458-1459; *People v. Shade, supra,* 185 Cal.App.3d at p. 716; CALCRIM No. 570.)

## III. Exclusion of Additional Acts of Domestic Violence by Mendez

Defendant contends that the trial court abused its discretion in limiting testimony about Mendez's abuse of defendant's sister and its exclusion of defendant's testimony that the police had not arrested Mendez or questioned him about the May 9, 2007, incident at Montiel's home in which Mendez assaulted defendant's sister and punched defendant in the face four times. Defendant argues that the evidence supported the defense theory that she committed the offense of voluntary manslaughter and not murder

because she "honestly believed that there was no alternative to the action which she undertook." That is, defendant contends that the excluded evidence was relevant to her request that the trial court instruct the jury on voluntary manslaughter based on a theory of imperfect defense of another. Even if the trial court erred, any such error was harmless.

We review a trial court's exclusion of evidence for an abuse of discretion. (*People v. Alvarez* (1996) 14 Cal.4th 155, 201.) We review the erroneous exclusion of evidence for prejudice under *People v. Watson* (1956) 46 Cal.2d 818, 836—i.e., whether there is a reasonable probability the admission of the evidence would have brought about a different result. (*People v. Fudge* (1994) 7 Cal.4th 1075, 1103.)

Even if the trial court erred in excluding the proffered evidence, any such error was harmless. As discussed above, the trial court properly did not instruct the jury on voluntary manslaughter based on a theory of imperfect defense of another because defendant's fear, if any, about Mendez's conduct concerned future and not imminent harm. That defendant may have known of additional instances when Mendez abused defendant's sister and defendant may have believed that the police had not interviewed Mendez about or arrested him for the May 9, 2007, assaults would have reinforced defendant's assertion that she believed that Mendez posed a danger to her sister. But the danger posed still would have been a future and not an imminent danger. Thus, such evidence would not have entitled defendant to an instruction on voluntary manslaughter based on a theory of imperfect defense of another and the exclusion of such evidence, if erroneous, was harmless under *People v. Watson, supra,* 46 Cal.2d at page 836. Moreover, the trial court admitted some evidence of Mendez's ill treatment of Montiel.

## IV.    Due Process and the Failure to Instruct on Heat of Passion Voluntary Manslaughter

Defendant contends that she was denied her Federal Constitutional right to due process when the trial court failed to instruct the jury on heat of passion voluntary manslaughter. By the trial court's failure, defendant contends, the jury was not instructed

13

that the prosecution had to prove the absence of provocation as an element of murder. Because only murder and not voluntary manslaughter was at issue in the trial, the trial court did not err in failing to instruct the jury that the prosecution had to prove beyond a reasonable doubt that provocation was lacking.

"When malice is an element of murder and heat of passion or sudden provocation is put in issue, the federal due process clause requires the prosecution to prove its absence beyond a reasonable doubt. (*Mullaney v. Wilbur* (1975) 421 U.S. 684, 704 [44 L.Ed.2d 508, 95 S.Ct. 1881].) Thus, in California, when a defendant puts provocation in issue by some showing that is sufficient to raise a reasonable doubt whether a murder was committed, it is incumbent on the prosecution to prove malice beyond a reasonable doubt by proving that sufficient provocation was lacking. (*People v. Rios* (2000) 23 Cal.4th [450], 461-462 [citing *Mullaney*].)" (*People v. Thomas* (2013) 218 Cal.App.4th 630, 643; *People v. Rios, supra,* 23 Cal.4th at p. 462 ["If the issue of provocation or imperfect self-defense is . . . 'properly presented' in a murder case [citation] the *People* must prove *beyond reasonable doubt* that these circumstances were *lacking* in order to establish the murder element of malice"].)

As discussed above, the trial court properly did not instruct the jury with a heat of passion voluntary manslaughter instruction. Because only murder and not voluntary manslaughter was at issue, the trial court did not err in failing to instruct the jury that the prosecution had to prove beyond a reasonable doubt that provocation was lacking. (See *People v. Rios, supra,* 23 Cal.4th at p. 462; *People v. Thomas, supra,* 218 Cal.App.4th at p. 643.)

## V.     Cumulative Error

Defendant contends that the cumulative prejudicial effect of the asserted errors requires reversal. Because we reject or find harmless each of defendant's contended errors, there is no cumulative prejudicial effect justifying reversal.

14

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


MOSK, J.


We concur:



TURNER, P. J.



KRIEGLER, J.


15