Filed 4/8/14  P. v. Ramirez CA1/3
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>v.<br><br>RODRIGO R. RAMIREZ,<br><br>　　　　Defendant and Appellant. | A137379<br><br>(Alameda County<br>Super. Ct. No. 166571) |
| In re RODRIGO R. RAMIREZ<br><br>　　　　on Habeas Corpus. | A140245 |

A jury convicted defendant of first degree murder. (Pen. Code, § 187.) He is serving 25 years to life in prison. At trial, the defense conceded that defendant killed a girl he hired for sex but claimed he killed her in the actual, though unreasonable, belief in the need to defend himself from death or great bodily injury after she tried to rob him. Defendant appeals his conviction on several grounds. He claims that (1) the trial court erred in excluding cell phone text messages about the victim or her boyfriend wanting to rob a prior client and that defense counsel rendered ineffective assistance of counsel in failing to raise all possible grounds for admission of the text messages; (2) the court erred in failing to instruct the jury on a heat of passion theory of voluntary manslaughter; and (3) there is insufficient evidence of premeditation and deliberation to support the jury's verdict of first degree murder.

Defendant also filed a petition for a writ of habeas corpus, which we have consolidated with the appeal. In his petition, defendant reiterates and expands upon his

1

claim of ineffective assistance of counsel. Defendant also asserts that the prosecutor misrepresented facts concerning the text messages sought to be introduced in evidence.

We shall affirm the judgment and deny the petition for a writ of habeas corpus.

## Statement of Facts

It is undisputed that defendant hired a girl for sex, choked her to death, and dumped her body on the street. The dispute at trial was why defendant killed her and, more specifically, his state of mind at the time.

On March 31, 2009, Tamara Thompson was 17 years old and working as a prostitute. Around 3:00 a.m. that day, her body was found "lying in the gutter" near Webster and 37th Streets in Oakland. The couple who found her had passed the intersection earlier and saw nothing unusual but discovered her body on the street near the curb when they returned to the area about 15 minutes later. Her fully clothed body was still warm when it was discovered. The couple called 911 and tried to resuscitate Thompson, without success.

### *The Autopsy*

A pathologist testified that the cause of death was asphyxia due to strangulation. The pathologist said Thompson's jugular veins in her neck had been compressed, preventing recirculation of oxygen-depleted blood from her brain, as evidenced by redness in her face and ruptured blood vessels in her eyes, known as petechial hemorrhaging. He noted hemorrhaging around the larynx and that the hyoid bone was dislocated, indicating "pressure was applied in a forceful manner" that reached "deep in the neck." The pathologist estimated that strangulation by occlusion of Thompson's jugular veins led to unconsciousness in 15 to 20 seconds, petechial hemorrhaging in 45 to 60 seconds, and death sometime thereafter. Thompson's neck showed no finger imprints, suggesting that she was strangled by an arm around the neck or some means other than manual strangulation.

The pathologist testified that Thompson suffered a rectal injury while alive. "[S]omething . . . penetrated her through the anus" and caused several "jagged" lacerations in the rectum, four inches from the anal opening, that caused bleeding. The

pathologist said something that "may have had a sharp edge to it" "was pushed in there that actually scraped and lacerated the inside of the rectum." He testified that a fingernail could have made the rectal lacerations. The pathologist observed "a lot of blood" on the sheet under Thompson's buttocks at the time of the autopsy and, while she had been menstruating at the time of her death, thought the amount of blood was too much to be attributed to menstruation alone. He noted that rectal lacerations "are generally very bloody, very hemorrhagic." Ultimately, the pathologist concluded the blood came from "a combination of the lacerations of the rectum and probably also from menstruation."

The autopsy also revealed a small bruise at the opening of the vagina. The bruising was consistent with sexual assault but also consistent with consensual intercourse or something striking the area. The pathologist took swabs of the mouth, vagina, rectum, breasts, neck and other areas of the body for the purpose of finding "whether the perpetrator of this homicide left any DNA behind or any other materials from his own body that could be found on her." The pathologist also collected fingernail clippings because "if one is being attacked, the victim may scrape the skin of the perpetrator, and we may then find his skin underneath those fingernails particularly the DNA."

### The DNA Evidence

A criminalist examined the biological material collected during the autopsy. The criminalist found male saliva on the breast swab and created a DNA profile from the saliva. The criminalist also found male DNA in the fingernail clippings that was consistent with the DNA extracted from the breast swab. In May 2009, the DNA profile was entered into the Combined DNA Index System (CODIS), which is a computer database used to find matching DNA profiles. A year later, in May 2010, defendant was identified as a match for the biological material taken from Thompson's body.[1]

---

[1] A CODIS search in May 2009 was unsuccessful. A year later, CODIS produced a match after defendant's DNA was collected upon his arrest on another charge. This information was not disclosed to the jury.

*Defendant's Police Interview*

Two homicide investigators interviewed defendant at an Oakland police station in June 2010. The interview was conducted mostly in Spanish as defendant said he was more comfortable speaking Spanish than English. The interview was recorded and translated. A transcript, with some redactions, was admitted into evidence. The interview lasted approximately three hours, 20 minutes. The transcript is 136 pages.

At the start of the interview, the police told defendant they were investigating a homicide. Defendant asked no questions about the victim or circumstances of the homicide. The police asked if defendant wanted to talk to them and defendant said "Yes, sure, I have nothing to hide." After some preliminary questions, the police asked defendant, who lived in Campbell, if he ever had been to Oakland. Defendant said he came to Oakland once, around April 2009, to "hire[] the services of a girl" for sex. He said he had sex with the girl at a motel, gave her a ride in his car to a gas station two blocks away, and was home by midnight. His description of the prostitute's race, age and hair color varied. She was first described as a White girl in a blond wig, then as a Black girl in a red wig. Defendant said the "girl" was about 20 years old then said she was "a grande older woman" between the ages of 39 and 40. The police showed defendant a photograph of Thompson, who was a young African-American, and defendant said she was not the prostitute he hired. Defendant said the girl in the photograph looked about 20 years old and was "too young" to be the woman he hired, who was age 39 to 40. When questioned further, defendant said the depicted girl "might be her."

In his initial description of the motel encounter, defendant said he and the prostitute undressed, he kissed her breasts, legs, arms and vagina, and had intercourse using a condom. The police asked defendant if he had a fight with the prostitute and he said "no, no, no." Defendant said if he had done something wrong, he would have gone to Mexico.[2]

---

[2] Defendant is an undocumented immigrant from Mexico.

The police asked defendant if he would recognize the motel and defendant said "I think so." The police drove with defendant around Oakland and defendant identified the Chaparral Motel at San Pablo and 54th Street. The men drove past where Thompson's body was dumped and an officer observed that defendant "looked over" at the area. They returned to the police station and resumed the interview.

The police told defendant the prostitute he hired is dead and that he was the only person who could have hurt her. A police officer asked defendant why he killed her and suggested possible reasons, saying "I don't know if she tried to rob you. I don't know if she tried to do something to you. I don't know if she did something bad with you but something went wrong, she's dead, your fingerprints and everything is on her . . . ." An officer told defendant the victim's cell phone signal was tracked to within blocks of his house on the day she died. Defendant denied killing her. He explained the cell phone signal by saying he found a cell phone under his car seat about a week after he hired the prostitute but did not relate it to her until he was questioned about it. He kept the phone and added it to his account. The officer asked defendant to explain how his DNA was under the victim's fingernails, and defendant said he was with a prostitute but did not kill her.

Defendant said he had no motive to kill the woman and the officer said killing without a motive was "scarier" than killing with one, and asked defendant: "Are you a psychopath? Are you crazy then?" The officer said he did not think defendant was a "psycho" and believed "something happened." Each of the two officers asked defendant if the prostitute tried to rob him, and one of them also asked "Was she hurting you? I know that girls do really bad things." Defendant replied: "She didn't do anything to me, we just had sex . . . . I went out, I gave her a ride, and I left, that's all I did."

Defendant repeatedly denied killing Thompson as the police detailed the evidence against him, including the fact that her cell phone signal was tracked from where she was found dead in Oakland to defendant's neighborhood in Campbell.[3] The police had been

---

[3] Cell phone tracking information was presented at trial.

interviewing defendant for over two hours when an officer told defendant: "we know that you did that to her, the only thing we want to know is what happened in that moment? Maybe you were drunk, maybe she wanted to rob you, or something happened with this lady and . . . you know something? I've spoken with many people like you who are in the same position you are, sitting on the same chair. For having a sane brain and heart, you must let it come out, do you understand?"

It was at this point, an officer testified, that defendant sighed, slumped forward, and changed his story. Defendant said, "She wanted to kill me with a knife." When asked to explain defendant said, "Can I have 5 minutes to calm down?" The police provided a few minutes for defendant to smoke a cigarette and compose himself.

When the interview resumed, defendant admitted killing Thompson and said he acted in self-defense. Defendant said they came to the motel and Thompson showered, during which time he locked the door, undressed and lay in bed. Thompson finished showering, demanded and received payment, then joined defendant in bed. Defendant started kissing Thompson's body when he heard a loud knock on the door. Defendant said Thompson yelled out "come in here. It's open." Defendant pushed Thompson aside and looked out the window. Two "Black, big guys" were standing outside the door. They yelled, "Open the door or die." When describing the scene, defendant made a hand gesture indicating a gun. Just then, two police patrol cars passed on the street and the men turned and left in a white car, "maybe a Lexus with really big rims."

Defendant said he turned back toward the room and Thompson jumped on him and hung on his neck. Defendant pushed her away. Thompson took out "[a] small knife, maybe 2 or 3 inches" long from her purse and swung it at him. She cut him but the cut was "very slight" "wasn't that bad" and "wasn't a serious injury." Defendant "gripped her neck and she began to struggle." He said, "I wasn't aware of the strength I was applying." Defendant said he was "angry," "scared" and "wanted to defend [him]self." He said: "she wanted to kill me, they wanted to hurt me, they wanted to rob me, I don't know, I was scared." When Thompson stopped moving, defendant dressed her and "put her all in order [so as] not to leave anything in the hotel." He carried her one or two

6

blocks to his car, then drove a few blocks and pushed her out of the car onto the street. He dumped the body because he "wanted to hide things." He did not call the police because he has "no documents" for legal residency.

Defendant denied having sex with Thompson, saying "[t]here was no time." He said he flushed the condom Thompson gave him down the motel toilet to "g[e]t rid" of "that evidence" because "she touched it." The police officers challenged defendant's claim of self-defense, remarking that he was a strong man, nicknamed Bear, weighing over 200 pounds and Thompson was a naked girl weighing just over 100 pounds.[4] Defendant insisted: "I had to kill her. If I hadn't killed her, she would have killed me."

***Closing arguments, jury verdict and sentencing***

No claim of self-defense was made at trial. Defendant claimed imperfect self-defense, with his attorney arguing to the jury that defendant had an actual, though unreasonable, belief in the need to defend himself from an imminent threat of death or great bodily injury. Defendant asked for a verdict of voluntary manslaughter. The prosecution argued that defendant was guilty of premeditated murder. The prosecution argued that defendant fabricated the attempted robbery and knife attack to hide a deliberate murder that was likely linked to a sexual assault of Thompson. The prosecutor noted that defendant denied having sex with Thompson, but the autopsy showed she had vaginal and rectal injuries and the latter injury produced a lot of blood and, thus, must have occurred after defendant hired her for sex. In arguing that defendant had sufficient time to premeditate, the prosecutor maintained that defendant could have stopped choking Thompson when she lost consciousness but, instead, made a decision "to finish the job."

The jury returned a verdict of first degree murder. The court sentenced defendant to prison for an indeterminate term of 25 years to life. Defendant timely filed a notice of appeal and petitioned for a writ of habeas corpus.

---

[4] Evidence at trial established that Thompson was five feet two inches tall and weighed 114 pounds. Defendant was five feet seven inches tall and weighed 224 pounds at the time of trial.

7

**Discussion**

I. *Any error in denying defendant's motion to reopen the case to admit text messages into evidence was harmless.*

Defendant unsuccessfully sought admission of certain text messages sent and received by Thompson's cell phone. On appeal, defendant contends the court erred in excluding the messages as hearsay and lacking foundation or, alternatively, that defense counsel rendered ineffective assistance of counsel in failing to establish a proper basis for admission of the text messages. In his habeas petition, defendant claims the prosecutor failed to correct materially false information about the text messages when admissibility was being argued to the court.

The text messages at issue were sent and received by Thompson's cell phone in the days surrounding her death in March 2009. The police obtained the text messages during their investigation, along with other cell phone records, including subscriber information, call logs, and signal location data. At trial, the prosecution marked all these cell phone records for identification, referred to their existence during opening statement, provided witness testimony concerning their preparation, and gave copies of them to the jury in an exhibit binder. After the close of testimony, all cell phone records were admitted with the exception of the text messages, which were withdrawn by the prosecutor. The contents of the voluminous text messages were reproduced in the jury exhibit binder during the presentation of evidence, but no text message was read to the jury. The text messages were removed from the exhibit binder after the prosecution chose, at the close of evidence, not to seek their admission.

Defense counsel filed a "Motion to Allow the Defense to Re-open their Case" seeking introduction of several of the text messages. Defense counsel said the texts were exchanged between Thompson and her pimp or someone "assisting the victim in her business, prostitution" and revealed a prior client robbery attempt corroborative of defendant's claim that Thompson tried to rob him. The prosecution objected to admission on hearsay grounds. The defense countered that the texts were admissible to prove the

8

declarant's state of mind. The court denied the motion, finding the proffered evidence inadmissible because it lacked foundation and was hearsay.

The texts sought to be admitted were exchanged between Thompson's phone and another phone on the morning of March 29, 2009, two days before Thompson was killed. In his petition for habeas corpus, defendant has submitted documents establishing that the other phone belonged to Raymond Marshall, Thompson's boyfriend. The petition includes a document showing that Marshall was interviewed by the police and, while denying being a pimp, admitted "serving as a lookout" for Thompson "while she worked the streets." The text messages sought to be introduced are set out here in full, without grammatical correction, and identify the time of the call and the phone's registered subscriber:

6:02 a.m.,[5] Marshall: "I sent you a text dat said i need u parked outside cause this nigha got more money and i want to rob him i need u parked outside and u want to get mad"

6:03 a.m., Marshall: "I seen dis nigha money"

6:04 a.m., Thompson: "Gig"

6:05 a.m., Thompson: "Im outside"

6:05 a.m., Marshall: "Wat the fuck that mean"

6:07 a.m., Thompson: "Im outside"

6:07 a.m., Marshall: "K"

6:11 a.m., Marshall: "Im bout to come out this nigha done took his pants with him in the shower I got 80 im bout to cut Pimp or die"[6]

In defense counsel's motion to reopen the case to admit this evidence, counsel argued that the texts showed Thompson's pimp wanted to rob one of her clients and

---

[5] The cell phone records use the Central Time Zone. The times stated here have been converted to the Pacific Time Zone.

[6] The words "Pimp or die" appear at the end of multiple texts sent from Marshall's phone. Defendant suggests that the words are an "automatic signature," but the words do not appear on every text.

Thompson assisted him by telling him she was outside the room. On appeal, defendant's appellate counsel suggests that Thompson and her pimp boyfriend, Marshall, temporarily switched phones, and that Thompson (using Marshall's phone), proposed the robbery of a client and it was her boyfriend who was outside.[7] Defendant, however, states that whether Thompson and her boyfriend switched phones is "not a determining factor in the case," claiming the texts admissible "no matter who instigated the texts." Defendant asserts that the trial court abused its discretion in denying the motion to reopen the case to admit the texts and deprived him of his due process right to present evidence.

"The decision to reopen a criminal matter to permit the introduction of additional evidence is a matter left to the broad discretion of the trial court." (*People v. Jones* (2012) 54 Cal.4th 1, 66.) "In determining whether a trial court has abused its discretion in denying a defense request to reopen, the reviewing court considers the following factors: '(1) the stage the proceedings had reached when the motion was made; (2) the defendant's diligence (or lack thereof) in presenting the new evidence; (3) the prospect that the jury would accord the new evidence undue emphasis; and (4) the significance of the evidence.' " (*People v. Jones* (2003) 30 Cal.4th 1084, 1110.)

The fourth factor, the significance of the evidence, was the trial court's focus of attention. The court found the proffered evidence inadmissible because it lacked foundation and was hearsay, noting that the texts were exchanged between Thompson's phone and another phone belonging to an "unknown party." Defendant has presented police affidavits and investigative materials with his writ petition showing Marshall, Thompson's boyfriend, to be that party. Defendant faults the prosecutor and defense counsel, who possessed these documents, for failing to inform the court that the pimp's identity was known. Defendant also argues that defense counsel was ineffective in failing

---

[7] In support of this theory, defendant notes that a text from Thompson's phone to Marshall's phone on the night of March 27 said "Ma battery is low" and on the morning of March 29, minutes before the above text exchange, a text from Thompson's phone to Marshall's phone said "Bring ma phne." Defendant also supports the argument by reasoning that "it seems clear that Thompson — as the prostitute — would be the one who was in the room with the client."

to present all meritorious arguments for admission of the text messages. Counsel argued that the texts were admissible to show declarant's state of mind, specifically Thompson's intention to rob a client on a prior occasion. (Evid. Code, § 1250.) Defendant claims counsel should also have argued the texts were admissible as nonhearsay conduct or, if hearsay, admissible as a statement against penal interest. (Evid. Code, § 1230.)

Despite the foundational weakness in the evidence, we will assume the texts were admissible, either for the reason presented to the trial court or for reasons that should have been presented. Nevertheless, reversal is not warranted because defendant has failed to establish prejudice. It is not reasonably probable that a result more favorable to defendant would have been reached had the texts been received in evidence. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)[8]

As an initial matter, it is not clear who instigated the plan discussed in the exchange of text messages. Defendant argued in the trial court that Marshall wrote a text to Thompson on his phone saying "i want to rob him." On appeal, defendant argues that Thompson wrote that text after borrowing Marshall's phone. Defendant's conflicting interpretations of the texts reflect an inherent ambiguity as to the identity of the writers, minimizing the significance of the texts. If Marshall, writing from his phone, told Thompson he wanted to rob a man and needed her parked outside, the prospective victim was not necessarily one of Thompson's clients and Thompson may not have been complicit in the plan. Even if we assume, as does defendant on appeal, that Thompson wrote the robbery text on a phone she borrowed from Marshall, the theft that was contemplated, picking the pocket of her prostitution client, is very different from the

---

[8] At oral argument, defendant's counsel emphasized that printouts of the text messages had been included in the jurors' exhibit binders during the course of trial. However, these pages were a small portion of the voluminous exhibits included in the binders, no specific attention was directed to those pages during the course of trial, and the jury was instructed to consider only those exhibits that were received in evidence. Thus, there is no reason to assume that jurors read or observed those pages. And if any juror did so, on defendant's view of the significance of the text messages, this could only have benefitted defendant's case.

armed attack defendant described to the police and would have provided limited corroboration of defendant's account of his encounter with Thompson.

Moreover, introduction of evidence impugning Thompson's character and suggesting her complicity in prior thefts risked introduction of evidence of defendant's character for violence. (Evid. Code, § 1103.) Defendant has a prior conviction for threatening his girlfriend with death or great bodily injury. (Pen. Code, § 422.) Defendant's criminal record was not disclosed to the jury but could have been had defendant reopened the case to adduce evidence of Thompson's alleged involvement in prior crimes.

Even if the texts had been admitted and credited by the jury as showing a prior thievery attempt, it is highly unlikely that this evidence would have altered the conclusion that the jury reached based on the strong evidence of defendant's guilt. Defendant's account of an armed robbery had critical weaknesses. There was a glaring discrepancy between his claim that the attempted robbery left him no time for sex with Thompson and the autopsy evidence showing that Thompson had rectal and vaginal injuries inflicted shortly before death. His explanation that he discarded the condom he received from Thompson simply because she touched it strains credulity, especially in light of his earlier explanation to the police that he had discarded the used condom. Defendant's conduct in taking time to dress Thompson's dead body and carry her from the room is inconsistent with his claim that Thompson had robbery cohorts whose return he presumably would have feared. Finally, the manner of killing indicates force in excess of any he would have believed necessary to defend himself from Thompson. Thompson was a naked girl weighing just over 100 pounds with "[a] small knife, maybe 2 or 3 inches" long. Defendant was twice her weight and, with a strong grip of her neck, quickly rendered her unconscious. The autopsy evidence showed that defendant continued to strangle her after she lost consciousness, resulting in her death. Defendant's claim that he killed Thompson with the belief that he needed to defend himself falters on the physical evidence that he applied force beyond the amount necessary to neutralize any perceived

threat. The court's denial of the motion to reopen the case to admit the text messages was harmless.

II. *The trial court had no duty to instruct the jury on a theory of heat of passion voluntary manslaughter, and trial counsel was not ineffective in failing to request an instruction, because there was insufficient evidence to support the theory.*

The trial court instructed the jury on first and second degree murder and the lesser included offense of voluntary manslaughter under a theory of imperfect self-defense. (CALJIC Nos. 5.17, 8.10-8.11, 8.20, 8.30, 8.31, 8.40, 8.50, 8.70-8.73.) Defendant contends the trial court erred in failing to instruct the jury, sua sponte, on the heat of passion theory of voluntary manslaughter. (CALJIC No. 8.42.) Alternatively, defendant contends trial counsel was ineffective in failing to request the instruction.[9]

" ' "It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence." ' " (*People v. Breverman* (1998) 19 Cal.4th 142, 154.) That obligation includes " 'giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present' " and there is substantial evidence to support the lesser included offense. (*Ibid.*) "In a homicide case, the trial court has a sua sponte duty to instruct on voluntary manslaughter as a lesser included offense of murder whenever there is evidence from which a reasonable jury could conclude that a manslaughter, but not a murder, was committed. [Citation.] This duty includes instruction on voluntary manslaughter due to a sudden quarrel or heat of passion when there is substantial evidence that shows such a theory is relevant." (*People v. Thomas* (2013) 218 Cal.App.4th 630, 643.) Moreover, "[h]eat of passion manslaughter is a lesser included offense of murder . . . because it negates the element of malice" and thus, where provocation is properly presented in a murder case, the failure to instruct the

---

[9] Jury instructions were discussed off the record, but it does not appear that trial counsel requested a heat of passion voluntary manslaughter instruction. During closing argument, defense counsel conceded that the heat of passion theory of voluntary manslaughter did not apply to the case.

13

jury on heat of passion relieves the prosecution of proving each element of murder and violates the defendant's federal due process rights. (*Id.* at p. 644, italics omitted.)

The evidence here did not support a heat of passion instruction and thus there was no error. "A heat of passion theory of manslaughter has both an objective and a subjective component." (*People v. Moye* (2009) 47 Cal.4th 537, 549.) " ' "To satisfy the objective or 'reasonable person' element of this form of voluntary manslaughter, the accused's heat of passion must be due to 'sufficient provocation.' " ' " (*Ibid.*) "The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection." (*Ibid.*) "To satisfy the subjective element of this form of voluntary manslaughter, the accused must be shown to have killed while under 'the actual influence of a strong passion' induced by such provocation. [Citation.] " 'Heat of passion arises when "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." ' " (*Id.* at p. 550.)

There is evidence supporting the objective component of the heat of passion theory of voluntary manslaughter. Defendant's police statement provided that evidence and, although self-serving, was entitled to consideration by the jury. (*People v. Thomas, supra,* 218 Cal.App.4th at p. 645.) "In deciding whether there is substantial evidence of a lesser offense, courts should not evaluate the credibility of witnesses, a task for the jury." (*People v. Breverman*, *supra*, 19 Cal.4th at p. 162.) Defendant claimed Thompson attacked him with a knife shortly after two of her accomplices came to the door of the room with a gun in an apparent robbery attempt. The Attorney General denies that there was sufficient evidence of provocation, noting defendant's greater size and strength, the admittedly slight injury produced by the small knife, and the quick departure of Thompson's accomplices. It is also noteworthy that defendant did not present a claim of self-defense at trial but claimed only imperfect self-defense, which suggests a recognition that Thompson's conduct, viewed objectively, did not place defendant in imminent

14

danger. Nevertheless, we believe that defendant's police statement describing an armed attack was sufficient evidence of provocation under the objective component of heat of passion manslaughter to warrant the jury's consideration.

There was not, however, evidence supporting the subjective component of the offense. For heat of passion voluntary manslaughter to apply, a defendant must "*actually* be motivated by passion in committing the killing." (*People v. Beltran* (2013) 56 Cal.4th 935, 951.) "This passion must be a ' " ' "[v]iolent, intense, high-wrought or enthusiastic emotion" ' " ' " (*id.* at p. 950) that obscures defendant's reason and causes him " ' "to act rashly or without due deliberation and reflection, and from this passion rather than from judgment" ' " (*People v. Breverman, supra,* 19 Cal.4th at p. 163). "[C]ase law and the relevant jury instructions make clear the extreme intensity of the heat of passion required to reduce a murder to manslaughter." (*Beltran, supra,* at p. 950.)

The evidence does not show that defendant acted rashly under the throes of intense emotion that obscured his reason. Defendant told the police he acted in self-defense and described deliberate conduct in responding to Thompson's knife attack and covering up the killing. He disarmed her, choked her until she stopped moving, flushed the condom she gave him down the motel toilet to "g[e]t rid" of "that evidence" because "she touched it," dressed her, "put her all in order [so as] not to leave anything in the hotel," carried her one or two blocks to his car, then drove some distance from the hotel and pushed her out of the car onto the street. He dumped the body because he "wanted to hide things." Defendant described his mental state during the attack as being "angry," "scared" and "want[ing] to defend myself." Defendant told the police: "I had to kill her. If I hadn't killed her, she would have killed me."

A defendant's anger or fear does not necessarily constitute grounds for instructing the jury on heat of passion voluntary manslaughter. "[T]he anger or other passion must be so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene." (*People v. Beltran, supra,* 56 Cal.4th at p. 949.) Nor does a claim of self-defense or imperfect self-defense, where the defendant claims he was attacked and feared for his life, necessarily warrant instruction on heat of

15

passion. (*People v. Moye, supra,* 47 Cal.4th at p. 555.) A heat of passion instruction is warranted where the defendant claiming self-defense presents evidence that he panicked and acted in a chaotic, unthinking response to the perceived threat. (*People v. Breverman, supra,* 19 Cal.4th at pp. 163-164.) An instruction is not warranted where the evidence shows the defendant acted deliberately to defend himself from the attack. (*Moye, supra,* at p. 555.) "[N]o principle of law" requires a trial court "to disregard the evidence in order to find that the jury should consider whether defendant subjectively killed in the heat of passion, when no substantial evidence supported that theory of manslaughter, and the evidence actually introduced on the point - the defendant's own testimony - was to the contrary." (*Id.* at p. 554.) The core of defendant's police statement was deliberate self-defense. There was insubstantial evidence that defendant subjectively killed under the heat of passion. Since there was insufficient evidence of heat of passion, the trial court had no duty to instruct the jury on that theory of voluntary manslaughter. For the same reason, trial counsel was not ineffective in failing to request an instruction.

Moreover, any error in failing to request or administer a jury instruction on heat of passion voluntary manslaughter was harmless beyond a reasonable doubt. "Error in failing to instruct the jury on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to defendant under other properly given instructions." (*People v. Lewis* (2001) 25 Cal.4th 610, 646.) The instructions here were unlike the instructions administered in *People v. Thomas, supra,* 218 Cal.App.4th at page 645 that were "bereft of any indication that the jury could consider [defendant's] emotional excitement as a factor that could reduce his criminal culpability" by negating malice. While the court here, as in *Thomas, supra*, at pages 643-644, did not instruct the jury with a heat of passion voluntary manslaughter instruction (CALJIC Nos. 8.42, 570), the court did, unlike *Thomas*, instruct the jury on the general impact of heat of passion and provocation on the element of malice and degrees of murder. The court instructed the jury: "If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation, so that it must have been

16

formed upon pre-existing reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is murder of the first degree." (CALJIC No. 8.20.) The jury was further instructed: "If the evidence establishes that there was provocation which played a part in inducing an unlawful killing of a human being, but the provocation was not sufficient to reduce the homicide to manslaughter, you should consider the provocation for the bearing it may have on whether the defendant killed with or without deliberation and premeditation." (CALJIC No. 8.73.) Unlike *Thomas,* the jury here found defendant guilty of first degree, not second degree, murder. (*Thomas, supra,* at p. 641.) In finding defendant guilty of first degree murder, "the jury necessarily found defendant premeditated and deliberated the killing. This state of mind, involving planning and deliberate action, is manifestly inconsistent with having acted under the heat of passion . . . ." (*People v. Wharton* (1991) 53 Cal.3d 522, 572.) In view of these instructions, and considering the factual determinations made by the jury in reaching a verdict of first degree murder, we conclude the jury would have returned the same verdict of first degree murder even if the heat of passion voluntary manslaughter instruction had been given. Accordingly, even if we assume the trial court erred in instructing the jury, any error was harmless.

III. *There is substantial evidence of premeditation and deliberation sufficient to support the jury's finding of first degree murder.*

Defendant claims the evidence presented is insufficient to establish premeditation and deliberation necessary for a first degree murder conviction. "In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The federal standard of review is to the same effect: Under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most

17

favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.] The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. [Citation.] ' "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' " (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

"An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse. [Citations.] However, the requisite reflection need not span a specific or extended period of time. ' " 'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .' " ' " (*People v. Stitely* (2005) 35 Cal.4th 514, 543.) " ' " 'Premeditation and deliberation can occur in a brief interval. 'The test is not time, but reflection.' " ' " (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1069.) "Appellate courts typically rely on three kinds of evidence in resolving the question raised here: motive, planning activity, and manner of killing. [Citations.] These factors need not be present in any particular combination to find substantial evidence of premeditation and deliberation." (*Stitely, supra,* 35 Cal.4th at p. 543.)

There is little evidence of motive and planning activity. The Attorney General notes that Thompson suffered injuries to her vagina and rectum and argues that the evidence points to a planned sexual assault and cover-up. A sexual assault provides some evidence of motive as a jury may infer defendant killed the victim to avoid detection and punishment. (*People v. Proctor* (1992) 4 Cal.4th 499, 529.)

The strongest evidence here, however, is the deliberate manner of killing. Defendant killed Thompson by strangling her, with his arm wrapped around her neck. The pathologist noted bleeding around the larynx and a dislocated hyoid bone, indicating

"pressure applied in a forceful manner" that reached "deep within the neck." The pathologist estimated that Thompson was rendered unconsciousness in 15 to 20 seconds, suffered petechial hemorrhaging in 45 to 60 seconds with the loss of blood circulation, and died sometime thereafter. The pathologist testified that brain death from strangulation generally takes "somewhere around four minutes" but can occur in less time. He estimated that Thompson was strangled "at least 45 seconds to a minute."

"This prolonged manner of taking a person's life, which requires an offender to apply constant force to the neck of the victim, affords ample time for the offender to consider the nature of his deadly act." (*People v. Hovarter* (2008) 44 Cal.4th 983, 1020; see also *People v. Stitely, supra,* 35 Cal.4th at p. 544 [strangulation is evidence of premeditation and deliberation].) Thompson lost consciousness after 15 to 20 seconds of being choked yet defendant continued to apply pressure for at least an additional 25 seconds and perhaps as long as an additional three minutes. The jury could infer that defendant's act in continuing to strangle Thompson after she lost all power to resist him was calculated to kill.

### Disposition

The judgment is affirmed and the petition for writ of habeas corpus is denied.

_____
Pollak, Acting P.J.

We concur:


_____
Siggins, J.


_____
Jenkins, J.

19