Filed 9/9/14  P. v. Ruiz CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E059385 |
| v. | (Super.Ct.No. FWV1000260) |
| OMAR JAFET RUIZ, | **OPINION** |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Stephan G. Saleson, Judge.  Affirmed.

Cannon & Harris and Gregory L. Cannon, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, and Peter Quon, Jr. and Raquel M. Gonzalez, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant Omar Jafet Ruiz and victim Vincent Mejia happened to attend the same party. There was bad blood between them; Mejia had reportedly threatened to kill defendant's child and "baby m[a]ma." When Mejia left the party, defendant followed him. An eyewitness, who considered himself friends with both men, saw defendant confront Mejia and then shoot Mejia. Mejia died at the scene.

A jury found defendant guilty of first degree murder (Pen. Code, §§ 187, subd. (a), 189) with an enhancement for personally, intentionally, and fatally discharging a firearm (Pen. Code, § 12022.53, subd. (d)). He was sentenced to a total of 50 years to life in prison.

Defendant's sole appellate contention is that the trial court erred by refusing to instruct on imperfect self-defense. We will hold that the asserted error was harmless in light of the evidence that defendant initiated the confrontation with Mejia, plus the lack of evidence that Mejia had a weapon, made any fresh threats, or did anything violent.

I

FACTUAL BACKGROUND

On January 28-29, 2010, defendant and his then-girlfriend Kimberly Mendoza attended a "get-together" at an apartment in Ontario. During the evening, those present ate, drank, gambled with dice, played video games, and smoked methamphetamine.

Sometime between 4:30 a.m. and 6:00 a.m., Vincent Mejia arrived. When Mejia knocked on the door, defendant lifted up his shirt, displaying a semiautomatic handgun tucked in his waistband.

2

Defendant's girlfriend owed Mejia $100. Mejia asked her about the money. She said she would pay him back the following week. He seemed "okay with that . . . ."

Ryan Gallegos had been at the party for a little while, but he left before Mejia arrived. Sometime after the sun rose, Gallegos returned to the apartment complex to rendezvous with Mejia. They were planning to go to Las Vegas together. In the parking lot, he saw defendant's SUV. He found it "odd" that defendant and Mejia were there at the same time, because defendant and Mejia "didn't get along."

Gallegos considered both Mejia and defendant to be friends of his. At the time, however, he owed defendant some money. He did not go back to the apartment because he did not want to "cross paths with" defendant. Instead, he phoned Mejia and asked him to come down. He waited for Mejia in the parking lot.

When Mejia came out, he was talking on his cell phone. He unlocked his car using the remote.

A minute or so after Mejia left the apartment, defendant left the apartment, too, explaining that he was going to go talk to Mejia. Gallegos was just putting his things (including some methamphetamine) in Mejia's car. He saw defendant and Mejia turn to each other in a way that made him apprehensive. They started talking. Gallegos was about 45 feet away and could not hear what they were saying.

Mejia started yelling. He called defendant a bitch several times. Gallegos could not remember whether defendant was also yelling. Gallegos believed they were arguing

3

over a $20 (or $120) gambling debt that defendant's girlfriend owed Mejia. He approached them and told them to stop.

Defendant then pulled out a semiautomatic handgun. As soon as Gallegos saw the gun, he ran. Multiple shots rang out. When Gallegos looked back, he saw Mejia lying on the ground.

Gallegos retrieved his stuff from Mejia's car and ran up to the apartment. He announced, "Omar shot Vince."[1] Then he ran back out of the apartment complex and over to another apartment complex. As he was running, he saw defendant's SUV go by. He phoned a friend who was still back at the party, who came and picked him up.

Meanwhile, on hearing the shots, defendant's girlfriend left the apartment to look for defendant and Mejia. She did not see Mejia's body and did not know what happened.[2] She found defendant near his SUV. He was looking around nervously. He drove them both to his home. She asked him what happened, but he said he did not want to talk about it.

Mejia died at the scene. Seven bullets hit him — three from the front and four from the back. It was impossible to tell in what order the bullets had been fired. A cell phone was "clenched" in his right hand. He had a knife, but it was folded up and in his pocket.

---

[1] According to Gallegos, he said, "Hey, Vincent was shot."

[2] In her statement to the police, however, she admitted that she knew someone had been shot and she "figured" it was Mejia.

At the scene of the shooting, the police found seven nine-millimeter shell casings, all fired from the same gun. The gun was never found.

Initially, Gallegos did not call the police. He explained that he was out on bail, awaiting sentencing. He did not want to get into trouble; also, he did not want to be considered a snitch once he got to prison. However, after police officers went to his house and talked to his mother (who worked for the Los Angeles Police Department), she made him go to the police.

Thus, on January 29, in the evening, Gallegos went to the police station, where he was interviewed. He later testified that, during the interview, he was under the influence of methamphetamine.

His statement was largely consistent with his testimony at trial, except that, at first, he identified the shooter only as a "guy" he did not know who had been at the party. He said that both the shooter and Mejia were "getting loud with each other" and "calling each other names."

After the police pretended to stop recording the interview, Gallegos told them that the shooter's name was Omar. He claimed he did not know Omar's last name. Then he said it started with an "L" and might be Lopez. Finally, he said it was "Luis or Ruiz or I don't know." When the police showed him a photo of defendant, he said, "Yeah. He's the one that shot fuckin' Vince."

Defendant's girlfriend testified that, in December 2009, she had been present when defendant was told that Mejia wanted to shoot up the home of defendant's "baby m[a]ma." Defendant said, "Fuck that bitch."

On February 1, police officers stopped and arrested defendant as he was driving with his girlfriend. His girlfriend was arrested along with him and interviewed.

Her statement to the police was largely consistent with her testimony at trial. She said she had heard that Mejia had put out a "hit" on defendant. She added that Mejia had threatened to kill defendant's baby mama and defendant's child. At the time of the shooting, however, defendant's baby mama was "locked up." Defendant wanted to confront Mejia about the threat, but he did not want to do it in the apartment out of respect for his host.

## II

## THE FAILURE TO INSTRUCT ON IMPERFECT SELF-DEFENSE,

## IF ERROR AT ALL, WAS HARMLESS

Defendant contends that the trial court erred by refusing to instruct on imperfect self-defense.

A.      *Additional Factual and Procedural Background.*

The trial court raised the issue of whether it should instruct on self-defense, apparently sua sponte. The parties agreed that there was no evidence of perfect self-defense. The trial court then indicated that it was not going to instruct on imperfect self-defense and explained why. It focused on Mejia's threat to shoot defendant's baby

6

mama; it ruled that this threat did not have sufficient imminence for purposes of imperfect self-defense.

It did instruct on "heat of passion" voluntary manslaughter. (CALCRIM No. 570.)

B. *Analysis*.

""""Under the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because the defendant *actually*, but unreasonably, believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime greater than voluntary manslaughter." [Citation.] . . . [I]mperfect self-defense is not an affirmative defense, but a description of one type of voluntary manslaughter. Thus the trial court must instruct on this doctrine, whether or not instructions are requested by counsel, whenever there is evidence substantial enough to merit consideration by the jury that under this doctrine the defendant is guilty of voluntary manslaughter. [Citation.] If it were a true affirmative defense, however, an instruction would be required only if it appears that the defendant was relying on the defense, or that there was substantial evidence supportive of the defense, and the defense was not inconsistent with the defendant's theory of the case. [Citations.]' [Citation.]" (*People v. Manriquez* (2005) 37 Cal.4th 547, 581.)

Defendant claims the trial court erred by focusing exclusively on the evidence that Mejia had previously threatened his "baby mama." He argues that there was also evidence that Mejia started yelling at him and repeatedly called him a bitch. He contends

7

that, from this evidence, the jury could have concluded that he honestly although unreasonably believed that he was threatened with great bodily injury or death.

We may assume, without deciding, that the trial court erred. Even if so, we conclude that the error was harmless. As defendant concedes, the California Supreme Court has held "that the failure to instruct sua sponte on a lesser included offense in a noncapital case is, at most, an error of California law alone, and is thus subject only to state standards of reversibility. . . . [S]uch misdirection of the jury is not subject to reversal unless an examination of the entire record establishes a reasonable probability that the error affected the outcome. [Citations.]" (*People v. Breverman* (1998) 19 Cal.4th 142, 165; accord, *People v. Blakeley* (2000) 23 Cal.4th 82, 93-94 [imperfect self-defense]; *People v. Randle* (2005) 35 Cal.4th 987, 1003 [imperfect defense of another], overruled on other grounds in *People v. Chun* (2009) 45 Cal.4th 1172, 1201.)[3]

Here, when Mejia first knocked on the door of the apartment, defendant responded by displaying the gun in his waistband. According to defendant's girlfriend, defendant

---

[3]     We acknowledge that recently, *People v. Thomas* (2013) 218 Cal.App.4th 630 held that a failure to instruct on "heat of passion" voluntary manslaughter as a lesser included offense of murder violates the federal constitution. (*Id.* at pp. 643-644.) It reasoned that heat of passion negates malice, and malice is a necessary element of murder; thus, failure to instruct on heat of passion unconstitutionally lessens the prosecution's burden of proving every element of the charged crime. (*Id.* at p. 644.)

Under the reasoning of *Thomas*, a failure to instruct on unreasonable self-defense, which likewise negates malice, would also be federal constitutional error. Until the California Supreme Court tells us otherwise, however, we consider ourselves bound by its decisions in *Randle* and *Blakeley*, *supra*, which specifically held that failure to instruct on unreasonable self-defense (or defense of another) is strictly an error of state law.

8

wanted to confront Mejia immediately; he refrained from doing so only out of respect for their host. Shortly after Mejia left, defendant followed him. While defendant did not necessarily qualify as an "initial aggressor" (see *People v. Enraca* (2012) 53 Cal.4th 735, 761; *People v. Seaton* (2001) 26 Cal.4th 598, 664), he was the one who chose to initiate the confrontation.

Mejia was unarmed; throughout the incident, he was clutching his cell phone. His only hostile conduct consisted of yelling and calling defendant a bitch. But according to Gallegos's statement to the police, both men were yelling at each other, and they were both calling each other names. There was no evidence that Mejia uttered any new threats or performed any violent act. Gallegos was moving toward the two men, telling them to stop and trying to break up the confrontation, when defendant pulled out a gun and fired. If necessary, defendant could have just brandished the gun. Moreover, he kept shooting until he had fired seven times; four of the shots were fired when Mejia was turned away from him. It is hard to accept that defendant could have believed, even unreasonably, that he had to shoot Mejia to avoid bodily harm or death. Hence, we see no reasonable probability that the jury would have found that defendant actually believed that he needed to defend himself.

We therefore conclude that defendant cannot show prejudice.

III

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RICHLI
J.

We concur:

McKINSTER
Acting P. J.

CODRINGTON
J.