Filed 9/2/16  P. v. Gomez CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E063034 |
| v. | (Super.Ct.No. RIF1305760) |
| ALEXANDER GILBERT GOMEZ, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Patrick F. Magers, Judge.  (Retired judge of the Riverside Super. Ct., assigned by the Chief Justice pursuant to art. VI, § 6, of the Cal. Const.)  Affirmed in part; reversed in part.

Jennifer Peabody, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Scott C. Taylor and Charles C. Ragland, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury found defendant and appellant Alexander Gilbert Gomez, guilty of (1) attempted murder (Pen. Code, §§ 187, subd. (a)), 664);[1] (2) assault with a firearm (§ 245, subd. (a)(2)); (3) aggravated mayhem (§ 205); (4) mayhem (§ 203); (5) criminal threats (§ 422); and (6) possession of a short-barreled shotgun (§ 33215). The jury found true the allegations that (1) the attempted murder, assault with a firearm, aggravated mayhem, mayhem, and criminal threat crimes were serious felonies (§ 1192.7, subd. (c)(8)); (2) defendant personally and intentionally discharged a firearm and proximately caused great bodily injury during the attempted murder, aggravated mayhem, and mayhem offenses (§ 12022.53, subd. (d)); (3) defendant personally used a firearm during the assault with a firearm and criminal threat offenses (§ 12022.5, subd. (a)); and (4) during the assault with a firearm, defendant inflicted great bodily injury (§ 12022.7, subd. (a)).[2] The trial court sentenced defendant to prison for an indeterminate term of 32 years to life.

Defendant raises three issues on appeal. First, defendant contends substantial evidence does not support his conviction for aggravated mayhem (§ 205). Second, defendant contends his attempted murder conviction is not supported by substantial evidence (§§ 187, subd. (a), 664). Third, defendant contends his conviction for simple mayhem (§ 203) should be dismissed because it is a lesser included offense of

---

[1] All subsequent statutory references will be to the Penal Code unless otherwise indicated.

[2] The jury was unable to reach a verdict on the allegation that the attempted murder was premeditated. The trial court declared a mistrial as to that allegation. (§ 1385.)

aggravated mayhem (§ 205). The People concede defendant's mayhem conviction should be reversed (§ 203). We reverse defendant's simple mayhem conviction (§ 203) but otherwise affirm the judgment.

## FACTUAL AND PROCEDURAL HISTORY

Defendant and his wife (Wife) lived in Perris. Wife married defendant in order to gain citizenship. Wife did not love defendant, but she was thankful for his help. Wife and defendant engaged in intercourse approximately one or two times per year; defendant did not have a strong sex drive. Defendant had a one-night stand with a male coworker. Wife had a sexual affair with the victim. The affair began around November 2009, within the first year of Wife's and defendant's marriage. The victim was defendant's acquaintance.

In 2012 Wife and defendant went to a doctor and were informed Wife was approximately three and a half months pregnant. Defendant's reaction to the news was "[t]otal silence." Wife and defendant had not engaged in sexual intercourse for more than six months, so defendant could not be the baby's father. The victim is the baby's father. Approximately one week after leaving the clinic, Wife told defendant that defendant was not the baby's father.

Approximately two months later, Wife again told defendant that defendant was not the baby's father. Defendant reacted by being silent for approximately one hour. Defendant then said it was not a problem, and that he and Wife would not tell anyone. Wife asked if defendant wanted her to leave their home, and defendant "said no." Wife

3

and defendant planned to raise the baby as defendant's child. Wife did not inform defendant of the baby's father's identity. The baby was born in January 2013.

On June 26, 2013, at approximately 11:00 a.m., the victim arrived at Wife's and defendant's home. The victim brought 15 to 20 beers in a cooler. Wife drank "a couple" beers. The victim drank three or four beers. Defendant was at work, and he typically worked until 5:00 or 6:00 p.m. At approximately 1:00 p.m., defendant arrived home early from work. Wife and the victim were in a guest bedroom. Wife heard defendant enter the house and put down his beer. Defendant typically brought home two 32-ounce bottles of beer—defendant regularly drank beer. Wife and the victim put on clothes. Defendant, looking for Wife, entered the guest bedroom. Wife had on a dress but no underwear. The victim was wearing pants, but no shirt and no shoes. Defendant appeared surprised, and he calmly asked what was happening. The victim said, "I'm sorry. I'm sorry. I'm sorry." Defendant realized Wife and the victim were having a sexual relationship.

Defendant and the victim went to the garage and spoke for approximately one or two minutes. The victim left the house. Defendant reentered the house and spoke to Wife. Wife asked for forgiveness and said she made a mistake. Defendant said, "[O]kay. That's fine. We're going to keep silent about that." Defendant appeared angry, but in control. Defendant asked if the victim was the baby's father because defendant knew defendant was not the baby's father. Wife said, "Yes, he is the father."

4

Approximately 20 minutes into their conversation, defendant asked Wife to call the victim, which she did. Defendant and the victim spoke for seven or eight minutes on the telephone, during which defendant expressed sadness about the affair and surprise that the victim "would do that." The victim said, "Forgive me. The only thing that I deserve is for you to come to my house and shoot me." Defendant responded, "No. Because I'm not going to be losing my job, my home. I don't want to lose my freedom." After the phone conversation defendant and Wife continued talking. Defendant and Wife talked for approximately one hour.

Defendant's good friend, who defendant thought of as a father, came to defendant's and Wife's house. Defendant went into the backyard, talked with his friend about what happened, and drank beer. Defendant cried during the conversation and the men hugged. Defendant spoke with his friend for two to three hours. Defendant, and possibly his friend, drank three or four large bottles of beer.

Defendant owned an AK-47 and two shotguns, one of which was a double barreled, sawed-off, 12-gauge shotgun. Defendant kept the unloaded guns in his room, under the bed. After talking with his friend, defendant retrieved the sawed-off shotgun. Defendant also took shells from his nightstand and placed them in his pocket. Defendant, trying to hide from Wife by sneaking along the side of her truck, put the shotgun in Wife's truck.

Wife saw defendant and asked, "Where are you going?" Defendant told Wife he was going to purchase more beer, although the beer the victim brought over was still at the house. Wife offered to drive defendant because she thought defendant had

5

consumed too much beer. Defendant did not appear drunk; he did appear to be "buzzed"—capable of driving, but smelling of alcohol. Wife told defendant three times that she would go with him to the store because she has "always gone" with him in the past. Defendant said, "No. I'll be right back." Each time Wife offered to go with defendant, he declined. Defendant left the house between 5:00 and 6:00 p.m. Defendant was calm when he left.

Defendant drove Wife's truck to the victim's house in Moreno Valley. The drive took approximately 20 minutes. Defendant parked in the driveway of the victim's house. The victim was in his backyard barbecuing dinner for his wife and two daughters. The victim heard his name being called, so he walked to the front of the house through the open garage door. The victim saw defendant, outside the truck, pointing a double-barreled gun at the victim's face. Defendant said, "I'm going to kill you and your family." The victim raised his hands near his face and walked toward defendant because he thought defendant would shoot him if he turned his back toward defendant. Defendant continued pointing the gun at the victim's face.

Within 30 or 40 seconds of the victim seeing defendant on the driveway, defendant shot the victim's face. The victim was between three and 16 feet away from defendant when defendant shot him. Defendant shot the victim with shot, rather than a slug. A slug is a chunk of metal. The shot defendant used was similar to bird shot, which is small pellets. Shot fired from a sawed-off shotgun spreads out more than shot fired from a regular length shotgun.

6

The victim fell to the ground.  The victim's wife ran into the garage after hearing the gunshot.  The victim's wife saw the victim on the ground with blood around his head.  The victim's wife asked defendant, "What did you do that for?"  Defendant replied, "Cause he fucked my wife that's why."  The victim's wife went back inside the house, locked the doors, and called 911.  While the victim's wife was speaking to 911, a second shot was fired; however, it is possible the second shot missed the victim—pellets struck a window, a loveseat beneath the window, and a white vehicle parked in front of the loveseat.  The second shot was fired approximately four minutes after the first shot.

Defendant drove away.  Defendant was gone from his house for approximately 45 minutes.  When defendant arrived back at his house, he told Wife, "[I] fucked up," and appeared "very disturbed."  Wife asked what happened, but defendant called his brother on the telephone.  Defendant met his brother at a liquor store.  Defendant's brother convinced defendant to surrender to the police.

During an interview, Moreno Valley Police Detective Holland spoke with defendant.  The following exchange occurred:

"Holland:  And—and your intentions were to kill him.  He was having—he was fucking your wife.

"[Defendant]:  I can't tell you that my intentions were to kill him, I—I—I—I don't know, in a split, in—in—in a split second, I don't know what—I don't know what I did.

"Holland:  Well, let's think about it though.

"[Defendant]:  I don't know what I did.

7

"Holland: Let's think about it . . .

"[Defendant]: I—I—I—I you—you—you would do the—you would do the . . .

"Holland: Hang on.

"[Defendant]: . . . common sense or logic or whatever, is gonna say well if you fuck my wife I'm gonna try to kill you, but no, you have anger, of course, you're—you're trying to find somebody that did something against your family, of course you're gonna have anger, and of course you're gonna try to be aggressive against that person.

"Holland: Right.

"[Defendant]: It doesn't say that I wanted to . . .

"Holland: Well, I mean le—let's go back to you're—you're at your house, your wife.

"[Defendant]: Noth—it wouldn't—it wouldn't have happened if I—if I didn't—if I didn't come and look for him it wouldn't have happened.

"Holland: Right.

"[Defendant]: I came and looked for him.

"Holland: So you—yeah, you came to his house with your gun loaded . . .

"[Defendant]: Yeah.

"Holland: . . . to kill him. Let's be honest with each other.

"[Defendant]: I didn't—I didn't—I mean—I mean, I can't say that I—I came here to kill him.

"Holland: Then what was your intent if—if it wasn't to kill him? If you're shooting somebody with a 12 gauge shotgun, uh, in the face, what other intent would there be?

"[Defendant]: I don't know—I don't know, I can't tell you that. I—I—I—I just started seeing stuff go through my mind and the only thing I could see is hatred, so I can't tell you what—I can't tell you that I wanted to kill him. I can tell you that I just wanted to get uh, I don't know—I don't know how to explain it, I just wanted . . .

"Holland: You wanted revenge."

When police arrived at the victim's house, the victim's "jaw [was] almost hanging off of his face." As a result of the shooting, the victim was in the hospital for more than a month. The victim lost half of his thumb, and suffered injuries to his cheek, teeth, tongue, ear, and eye. The victim continues to suffer vision problems, balance problems, dizziness, headaches, numbness in his face, and has metal plates where his cheek bone had been.

## DISCUSSION

### A.    AGGRAVATED MAYHEM

Defendant contends substantial evidence does not support his conviction for aggravated mayhem (§ 205) because the record lacks evidence that defendant acted with the intent of causing a permanent disability or disfigurement. Defendant contends he acted only with the intent to kill.

9

"To assess the evidence's sufficiency, we review the whole record to determine whether any rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt.  [Citation.]  The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value— such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]  In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)  "'We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.  [Citation.]'  [Citation.]  A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict." (*Ibid.*)

An element of aggravated mayhem is the specific intent to cause permanent disability or disfigurement of another human being.  (§ 205.)  A victim being "shot in the head can support an inference of an intent to kill." (*People v. Manibusan* (2013) 58 Cal.4th 40, 88 (*Manibusan*).)  However, shooting a victim's head can also "support an inference of an intent to cause permanent disability or disfigurement.  'It takes no special expertise to know that [a shot fired at a victim's head] from close range, if not fatal, [is] highly likely to disable permanently.'" (*Ibid.*)  "'[A] defendant may intend both to kill his or her victim and to disable or disfigure that individual if the attempt to kill is unsuccessful,' and evidence that is sufficient to establish a defendant's intent to

10

kill the victim can also be 'sufficient to establish the intent to permanently disable or disfigure that victim.'" (*Id.* at p. 89.)

Defendant shot the victim with birdshot from a sawed-off shotgun. A shortened barrel causes the birdshot to have greater spread. Because the birdshot has greater spread from the shortened shotgun, the small pellets would not be focused on a single area of the victim's body, rather, they could spread out, causing disfigurement or disability, but not death. Defendant told Holland that he could not say he intended to kill the victim. The jury could reasonably conclude from the ammunition, weapon, and defendant's statement to Holland that defendant intended to harm the victim by disabling or disfiguring him.

Defendant contends the record lacks evidence of an intent to maim because the record reflects only that defendant intended to kill the victim. Defendant highlights evidence such as defendant telling the victim, "I'm going to kill you and your family." As explained by our Supreme Court, "'[A] defendant may intend both to kill his or her victim and to disable or disfigure that individual if the attempt to kill is unsuccessful.'" (*Manibusan*, *supra*, 58 Cal.4th at p. 88.)

Contrary to defendant's position, the record in this case reflects defendant both intended to kill the victim and to disable or disfigure him if the attempt to kill did not succeed. Defendant told Holland that he could not say he intended to kill the victim. Additionally, defendant shot the victim with birdshot, which is small pellets. The small pellets had greater spread from defendant's sawed-off shotgun than they would from a shotgun of regular length. The jury could infer from this evidence that defendant

11

wanted to at least maim the victim because defendant chose a weapon that would kill and/or maim. If the shooting did not result in the victim's death, then the small pellets would permanently disfigure or disable the victim.

In sum, it can reasonably be concluded from the evidence that defendant intended to inflict permanent disability or disfigurement upon the victim, and therefore, we conclude substantial evidence supports defendant's aggravated mayhem conviction.

### B.    ATTEMPTED MURDER

Defendant contends substantial evidence does not support his conviction for attempted murder. (§§ 187, subd. (a), 664.) Defendant asserts the evidence reflects he acted in the heat of passion and therefore is guilty of attempted voluntary manslaughter.

The substantial evidence standard of review is set forth *ante*, so we do not repeat it here. "'The mental state required for attempted murder has long differed from that required for murder itself. Murder does not require the intent to kill. Implied malice—a conscious disregard for life—suffices. [Citation.]' [Citation.] In contrast, '[a]ttempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.'" (*People v. Smith* (2005) 37 Cal.4th 733, 739.)

Prior to defendant leaving his house, he retrieved his sawed-off shotgun from under his bed. The gun was unloaded, so he took ammunition from his nightstand. Defendant snuck along the side of Wife's truck, so she would not see him put the shotgun inside of it. One can infer defendant selected the sawed-off shotgun, in part, because it was easier to conceal than his AK-47 and second shotgun. Thus, defendant

12

had the presence of mind to select a gun that would be easier to conceal, and he knew to hide his actions from Wife.

Wife saw defendant and asked where he was going. Defendant said he was leaving to purchase beer. Wife offered multiple times to drive defendant to the store, but defendant declined her offers. This evidence shows defendant had the presence of mind to lie to Wife about his actions. One can reasonably infer defendant lied to Wife so that she would not stop him from carrying out his plan to shoot the victim.

Defendant was calm when he left, which indicates he could appreciate his choices and actions. Defendant then drove 20 minutes from Perris to Moreno Valley, and parked in the driveway of the victim's house. This evidence reflects defendant had the presence of mind to navigate a car for 20 minutes and to arrive at his exact destination. Defendant called the victim's name, and stood behind the door of the truck while pointing his shotgun at the victim's face. This evidence reflects defendant lured the victim to him by calling the victim's name, as opposed to being so angry and upset that he tore through the victim's open garage to hunt the victim down. Additionally, defendant stood behind the open truck door, which gave him protection should the victim be armed, which reflects planning.

Defendant told the victim he was going to kill him. Defendant shot the victim's face. The victim fell to the ground. Approximately four minutes later, a second shot was fired. From this evidence, the trier of fact could infer that defendant shot the victim with the intent of killing him because defendant said he was going to kill the victim; and he shot the gun twice, once at the victim's face, which indicates he wanted to inflict a

13

mortal injury on the victim. (See *Manibusan*, *supra*, 58 Cal.4th at p. 88 [a victim being "shot in the head can support an inference of an intent to kill"].)

In sum, the evidence reflects a calm and calculated decision to kill the victim. Defendant had the presence of mind to hide the weapon, lie to Wife, drive for 20 minutes, lure the victim out of his house, and take cover behind the vehicle's door prior to shooting the victim. Thus, we conclude substantial evidence supports the jury's finding that defendant had the specific intent to kill the victim.

Defendant contends the evidence only supported a finding that he acted in the heat of passion, which would necessitate his conviction be reduced to attempted voluntary manslaughter. Defendant highlights evidence favorable to his argument. For example, he points to evidence that defendant learned, for the first time, in the hours before the killing, that the baby was the victim's child. Under the substantial evidence standard of review we must resolve conflicts in the evidence in favor of the prosecution. (*People v. Zamudio*, *supra*, 43 Cal.4th at p. 357.) There is evidence that defendant was "totally calm" and "tranquil" before leaving his home and driving to the victim's home. Thus, we must resolve any conflicting evidence regarding defendant's mental and emotional states in favor of the conclusion that he was calm and tranquil—acting deliberately and with reflection. (See *People v. Thomas* (2013) 218 Cal.App.4th 630, 642 [heat of passion means a person acts without rational thought and without reflection].) Accordingly, we find defendant's argument to be unpersuasive.

Defendant contends Wife's testimony was inherently improbable and therefore cannot constitute substantial evidence—it was Wife who testified defendant was calm

14

and tranquil. "The uncorroborated testimony of a single witness is sufficient to sustain a conviction, unless the testimony is physically impossible or inherently improbable." (*People v. Scott* (1978) 21 Cal.3d 284, 296.) When defendant learned about Wife's pregnancy he reacted with silence. When defendant learned he was not the baby's father, he reacted with silence and after an hour said it was not a problem. When defendant discovered Wife and the victim in a bedroom in his home, he asked what was happening, let the victim leave the house, and spoke with Wife for an hour, during which he decided they would not talk about the affair. Defendant then had a friend come to the house and they talked for two or three hours and defendant cried. We see nothing inherently improbable about Wife's testimony. It appears defendant was not an emotional person in terms of anger—he reacted with silence to the news about the pregnancy and the news that he was not the baby's father, and he chose silence as a solution to deal with the affair after talking with Wife.

Wife's testimony is reasonable. Because defendant had learned months earlier that he was not the baby's father, the upsetting discoveries on the day of the shooting were (1) learning the victim was the baby's father; and (2) seeing Wife in a bedroom with the victim. Because defendant reacted only with silence on prior occasions— learning about the pregnancy and learning he was not the child's father, it is reasonable to conclude that he would also react with little emotion, i.e., appear calm, upon learning the victim was the baby's father and upon seeing Wife in a bedroom with the victim. In sum, we conclude Wife's testimony constitutes substantial evidence—it is not inherently improbable.

15

C.    LESSER INCLUDED OFFENSE

Defendant contends his conviction for mayhem (§ 203) should be dismissed because it is a lesser included offense of aggravated mayhem (§ 205). The People concede defendant's mayhem conviction (§ 203) should be reversed.

"A defendant cannot be convicted of both an offense and a lesser offense necessarily included within that offense, based upon his or her commission of the identical act." (*People v. Binkerd* (2007) 155 Cal.App.4th 1143, 1147.) This court has concluded "under the statutory elements test, simple mayhem in violation of section 203 is a necessarily included lesser offense of aggravated mayhem in violation of section 205." (*People v. Robinson* (2014) 232 Cal.App.4th 69, 79.)

In the information, the simple mayhem (§ 203) and the aggravated mayhem (§ 205) were both alleged to have occurred on or about June 26, 2013, and the victim was listed as being the victim of both offenses. During closing argument, the prosecutor asserted the aggravated mayhem and simple mayhem occurred when defendant shot the victim's face. Thus, the aggravated mayhem and simple mayhem convictions are based upon the same act. Because simple mayhem (§ 203) is a lesser included offense of aggravated mayhem (§ 205), and the convictions are based upon the same act, defendant's simple mayhem conviction (§ 203) must be reversed.

**DISPOSITION**

Defendant's conviction for simple mayhem (§ 203) (count 4) is reversed. The trial court is directed to issue an amended abstract of judgment removing the simple mayhem conviction (§ 203) and its associated stayed sentence, and to forward a

certified copy of the amended abstract to the Department of Corrections and Rehabilitation. (Pen. Code, §§ 1213, 1216.). In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
J.

We concur:

McKINSTER
Acting P. J.

SLOUGH
J.

17